**ORIGINAL**

530 new

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name  Cooks                  Harry
            (Last)              (First)              (Initial)

3

4  Prisoner Number   C – 8 4 3 5 4

5  Institutional Address  CSP-Solano – P.O. Box 4000
                          Vacaville, CA 95696-4000

FILED
AUG 27 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RMW

6

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  **HARRY COOKS,**
   (Enter the full name of plaintiff in this action.)

9
                        vs.
10  **D.K. SISTO, Warden,**

11  **BOARD OF PAROLE HEARINGS.**

12

13

14  (Enter the full name of respondent(s) or jailor in this action)

15

CV 08 No.  4106
(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**

(PR)

E-filing

16  <u>Read Comments Carefully Before Filling In</u>

17  <u>When and Where to File</u>

18       You should file in the Northern District if you were convicted and sentenced in one of these

19  counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located.  If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10 <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13                 County Superior Court, Oakland):

14          <u>Superior Court</u>                    <u>Alameda County</u>

15          Court                              Location

16          (b)    Case number, if known _<u>77583</u>_____

17          (c)    Date and terms of sentence _<u>25 years to life</u>_____

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                 parole or probation, etc.)         Yes_<u>X</u>_    No _____

20          Where?

21          Name of Institution: _<u>CSP-Solano</u>_____

22          Address: _<u>P.O. Box 4000 - Vacaville, CA 95696-4000</u>__

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 challenging more than one sentence, you should file a different petition for each sentence.)

26 _____

27 _____

28 _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

Arraignment:                          Yes __X__    No _____

Preliminary Hearing:                  Yes __X__    No _____

Motion to Suppress:                   Yes __X__    No _____

4. How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?        Yes __X__    No _____

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                     Yes __X__    No _____

(b)    Preliminary hearing             Yes __X__    No _____

(c)    Time of plea                    Yes __X__    No _____

(d)    Trial                           Yes __X__    No _____

(e)    Sentencing                      Yes __X__    No _____

(f)    Appeal                          Yes __X__    No _____

(g)    Other post-conviction proceeding    Yes _____    No __X__

8. Did you appeal your conviction?       Yes _____    No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal                  Yes __X__    No _____

Year: __1984__    Result: __Judgement Affirmed__

Supreme Court of California      Yes __X__    No _____

Year: __1984__    Result: __Hearing Denied__

Any other court                  Yes _____    No __x__

Year: _____    Result: _____

(b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                   Yes _____    No__X__

2    (c)    Was there an opinion?                Yes _____    No_X__

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                Yes _____    No_____    N/A

5    If you did, give the name of the court and the result:

6                        N/A
     _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes _X_    No_____

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16   (a)    If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding. Attach extra paper if you need more space.

18   I.     Name of Court: _Superior Court, Alameda County_____

19          Type of Proceeding: _Habeas Corpus_____

20          Grounds raised (Be brief but specific):

21          a._Same grounds raised inthis petition_____

22          b._____

23          c._____

24          d._____

25          Result: _Petition Denied_____Date of Result:_12-21-07_

26   II.    Name of Court: _State Supreme Court_____

27          Type of Proceeding: _Habeas Corpus_____

28          Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

Same grouns raised in this petition

a._____

b._____

c._____

d._____

Result: __Petition Denied_____ Date of Result: 6-16-08

III.   Name of Court: _____N/A_____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

IV.   Name of Court: _____N/A_____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____ Date of Result:_____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes X_____   No_____

Name and location of court: U.S. Dstrict Court, Norhtern District

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS    - 5 -

1   need more space.  Answer the same questions for each claim.

2      [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One:___ PETITIONER CONTENDS THAT HE IS BEING DENIED HIS LIBERTY INTEREST RIGHT

6   BY THE BOARD OF PAROLE HEARINGS WITHOUT THEIR BEING A PREPONDERANCE OF EVIDENCE TO
    DENY PAROLE THROUGH THE USE OF ERRONEOUS PAROLE PROCEDURES IN VIOLATION OF THE STATE
    AND FEDERAL CONSTITUTION

7   Supporting Facts:___ On or about August 8, 2007, Petitioner appeared before

8   the Board of Parole Hearings for his fourth parole consideration

9   hearing and was denied parole for three years based upon the nature

10  of the crime (unchanging factors) without their being some or a

11  Claim Two:_____

12  _____

13  Supporting Facts:_____

14  _____

15  _____

16  _____

17  Claim Three:_____

18  _____

19  Supporting Facts:_____

20  _____

21  _____

22  _____

23     If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

preponderance of evidence to substantiate the denial of Petitioner's Liberty Interest after serving the statutory minimum of sixteen (16) calendar years and the statutory twenty five (25) years minimum maximum on a First Degree Murder in violation of the State and Federal Constitution. The Board identified Petitioner's crime as being **"carried out in an especially cruel manner, carried out in a dispassionate and calculated manner."**

The Board also found that Petitioner poses an unreasonable risk of danger to society or a threat to public safety. **See Exhibit "A" hereto attached.**

Petitioner contends that these are all inserted reasons by the Board that was not found by a jury.

Petitioner contends that when he appeared before the Board he had met 99% of the Boards previous recommendations and the Board did not have sufficient evidence to substantiate a denial of parole.

Petitioner contends that the Board's reliance upon the nature of Petitioner's commitment offense and that the commitment offense was carried out in an **"especially cruel, callous, dispassionate and in a manner that demonstrates an exceptionally callous disregard for human suffering"** are all stated with legal authority or evidence to substantiate such a finding by the Board that justify a denial of setting a parole release date.

Petitioner contends that the record before the Court contains no evidence that supports the nature of the offense being carried out in the way that the Board has described and identified Petitioner's crime or that Petitioner would pose an unreasonable risk of danger to society or a threat to the public if released from prison.

Petitioner contends that the Board asserting that the nature of the crime was carried out any different from any other First Degree Murder beyond what was minimally necessary to convict Petitioner must fail because the records contains no such evidence to support the nature of the crime being out of the ordinary.

Petitioner contends that the law is clear that California Life prisoners have a liberty interest right to parole as it stands today. **Sass v. Cal. Bd. of Prison Terms**, 2006 W.L. 250693. **Irons v. Carey**, (9th Cir. 2007) 408 F. 3d 1685, NO. 05-1525.

Petitioner contends that a parole board's decision, like a prison disciplinary board's decision, deprives a prisoner of due process if it is not supported by "some evidence" or is "otherwise arbitrary." Hill, 472 U.S. at 457; see McQuillion v. Duncan, 306 F. 3d 895, 904 (9th Cir. 2002). The Board did not explain in their denial of setting a parole release date how their determination in this case satisfied the "some evidence" portion of the Hill Rule and the Board does not acknowledge the "otherwise arbitrary" portion of the rule in denying Petitioner Liberty Interest right to parole after serving the statutory minimum requirement.

Petitioner contends that the Board's decision to deny Petitioner his liberty interest right to parole is contrary to, and an unreasonable application of, clearly establish federal law as determined by the United States Supreme Court. The record before this Court does not support the Board's finding. The Board failed to explain in the decision to deny parole how they determined in this case satisfied the "some evidence".

Petitioner contends that this Court must make "an independent review of the record to determine whether the Board of Parole Hearings clearly erred in its application of controlling federal law and that the decision of the board to deny parole based upon unchanging factors was legally proper under United States precedent case law. Only by that examination by this Court may the determination be made that the board's decision to deny parole was objectively reasonable. Delgado v. Lewis, 223 F. 3d 976, 982 (9th Cir. 2000) (internal citation omitted); see also Pham v. Terhune, 400 F. 3d 740, 742 (9th Cir. 2003); Pirtle v. Morgan, 313 F. 3d 1160, 1167 (9th Cir. 2002) ("We have relaxed AEDPA's strict standard of review when the state court reaches a decision on the merits but provides no reasoning to support its conclusion.")

Petitioner contends that in the present case before the Court the

decision from the Board Transcripts does not explain what evidence was used to determine that Petitioner is a present threat to society to deny parole. There is no hint in the board decision that the nature of the crime is more than any other second degree murder. There is no hint in the boards denial of what factual evidence was used other than empty words that the nature of the crime justify denial of parole.

The board reliance on the nature of the crime are unchanging factors that will never change and precedent case law prohibits the use of unchanging facts as a reliable means to deny Petitioners liberty interest right to parole and the Board failed to apply Hill's, supra "some evidence" test to the facts of this case.

Petitioner contends that the boards citing the gravity of Petitioner's convicted offense, his criminal past doesn't constitute some evidence to support the boards decision to deny Petitioner his liberty interest right to parole, especially without relying on evidence that is present which would verify that Petitioner is a present threat to society today, not twenty five (25) years ago when the crime was committed. The Board Transcript doesn't describe evidence that Petitioner is a dangerous threat to society today and 25 years after the commission of his crime and without any explanation as to how the evidence can satisfy the Hill standard or why it does. Why, for example, does this particular conviction constitute "some evidence" that Petitioner presently constitutes a danger to society? Why is this offense particularly grave"? How can the nature of this offense constitute a denial of parole? On the contrary. The record from the Staff Psychologist clearly states that Petitioner is not a threat or present danger to society. **See Exhibit "B"** hereto attached. There is no logical or legal explanation to these questions and the Board did not provide one in the board transcripts that is before

the Court and this Court must now provide one according to precedent case law.

Petitioner contends that the "some evidence" standard should not apply to a Court's review of parole decision. See Carrillo v. Fabian, Supreme Court of Minnesota 710 NW 2d 763. Petitioner contends that the "some evidence" standard, the narrowest review standard (requiring but any evidence whatsoever, according to the California Supreme Court) should not apply to a review of the evidence involved in this State's parole decisions.

Petitioner contends that the "some evidence" standard of judicial review evolved from Superintendent v. Hill (1985) 472 445, 455 ["Hill"]. See In re Powell, 45 Cal. 3d at 904. It is difficult to understand why the narrowest of standards should apply. First, the United States Supreme Court prescribed it in Hill, supra, to apply a hearing at which disciplinary charges were based on a confidential source causing the prisoner's due process right to be diminished by the prison's need for security and confidentiality. A California lifer's due process right is not diminished because neither the parole determination process used by BPH nor adjudication of habeas claims requires or involves any security concern.

Second, the State's courts that adopted Hill's, supra, some evidence standard to review parole decisions expressly held that California's life prisoners did not have due process liberty interest in a parole grant. In re Powell, supra, 45 Cal. 3d at 911. The contrary has now been established. McQuillion, 306 F. 3d at 902; Rosenkrantz, 29 Cal. 4th at 621. Sass v. Cal. Bd. of Prison Terms, 2006 W.L. 2506393. Irons v. Carey, supra, (9th Cir. 2007) 408 F. 3d 1165, No. 05-15275. Due process demands a finding of something more than "some" (any) evidence in the record to protect what is now defined as a vested liberty interest protected by the Due Process Clause.

10.

Third, Hill, excluded claims that alleged that the procedure used by the agency did not comply with state law. (472 U.S. at 457 ["respondents relied only upon the Federal Constitution, and did not claim that the disciplinary board's findings failed to meet evidence standards imposed by state law"].)

Petitioner contends that it is long overdue in the State of California to secure a court ruling as that of the Supreme Court of Minnesota in the case of Carrillo v. Fabian, supra, 701 N.W. 2d 763 (2005) which held that Minnesota state prisoners have a protected liberty interest in parole that requires a broader standard, i.e., a hearing panel's decision must be based on a "preponderance of the evidence." Also see Davis v. Board of Parole and Post-prison Supervision (2005) 200 Or. App. 366 (Oregon); Trantino v. New Jersey State Parole Board (2001) 64 A. 2d 940 ["substantial evidence" required to support parole decisions].

Petitioner submits that it is time for our State and Federal Court's to apply the Minnesota Supreme Court's reasoning to go along with the Liberty Interest Ruling in the Ninth Circuit Ruling in Sass v. Cal. Bd. of Prison Terms, supra, and Irons v. Carey, supra, to require a preponderance of the evidence in the record to uphold a governor's or BPH panel's parole decision. The Board's decision are supposed to be based on a preponderance of the evidence of parole suitability in the record. Good cause" is the standard. (In re Powell, supra, 45 Cal. 3d at 901; In re Brown (1967) 67 Cal. 2d 39, 342; In re McClain (1960) 55 Cal. 2d 78, 87; In re Caswell (2001) 92 Cal. App. 4th 1017, 1024, 1026; In re Clutchett (1974) 39 Cal. App. 3d 561, 656; In re Monzo (1973) 33 Cal. App. 3d 144, 147; 15 CCR § 2450, "good cause" being defined by the Board as "a preponderance of the evidence that there is a factual basis and good reasons for the decision." (15 CCR §2000(b)(49) (emphasis added.)

11.

THE BOARD OF PAROLE HEARINGS IS CHARGED WITH DETERMINING THE PAROLE
SUITABILITY OF PRISONERS SERVING INDETERMINATE
LIFE TERM SENTENCES

## II.

Petitioner contends that the Board of Parole Hearings is obligated to set a release date for life term inmates at the parole consideration hearing unless the inmate poses a significant risk to public safety.  Penal Code Section 3041(b).

THE BOARD OF PAROLE HEARINGS HAS SET FORTH "GUIDELINES"
TO AID IN ITS PAROLE SUITABILITY DETERMINATIONS.
15 CCR 2281 & 2402

## III.

PETITIONER'S POSITIVE EFFORTS OVER THE PAST TWENTY FIVE YEARS
SUPPORTS SUITABILITY FOR PAROLE AND OUTWEIGH ALL NEGATIVE
FACTORS OF UNSUITABILITY FOR PAROLE

## IV.

Petitioner contends that there are nine (9) points of suitability pursuant to 15 CCR §2281 and 2402, and six (6) criteria of unsuitability which states in pertinent part;

A.  CIRCUMSTANCES TENDING TO SHOW SUITABILITY.

1.  **NO JUVENILE RECORD.**  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential for personal harm to victims.  15 CCR §2281(d)(1).

A hard look at Petitioners file indicates that there  is no evidence that he has ever caused physical harm to anyone during the commission of a crime other than the present crime.   Likewise, there is not a single allegation of assault or violence in which Petitioner has been convicted of throughout his criminal history. **See Exhibit "B" hereto attached.**   Since Petitioners incarceration he has not been cited for any violence and has been cited for mainly disciplinary infractions that had to deal with the grooming standards which was subsequently dismissed.  Since his

incarceration over the past twenty five years Petitioner's other disciplinaries were of a minor nature and none were for any acts of violence.

2.  **STABLE SOCIAL HISTORY.**  The prisoner has experienced reasonably stable relationships with others.  15 CCR §2281(d)(2).

"[T]he first fourteen years of Petitioner's life was spent in a stable, emotional close family environment with his biological mother and father in Alabama and California where he had good parental example and supervision.  Petitioner's parents divorced when he was fourteen years old and hi mother raised him. Petitioner was suspended from high school in the eleventh grade and went on and did some junior college work.  Petitioner received his GED since being incarcerated and participated in vocational trades and has received vocational certificates in milling cabinetry, upholstery and auto body.  **See Exhibit's "A" and "B".**

Petitioner has a place of residence with his mother in Oakland, California and a job offer upon being released.  **See Exhibit "C" hereto attached.**  Petitioner has participated in several self-help programs since his incarceration and the central file contains verification.  The Central File contains impressive letters of support with pledges to aid in whatever way they can, offering living accommodations, employments, employment opportunities, and even financial assistance.  **See Exhibit "C".**

3.  SIGNS OF REMORSE.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.  15 CCR §2281(d)(3).  Petitioner has demonstrated that he regret his decision and still carries remorse for what he did 25 years ago.  **See Psychologist and Counselors Report hereto attached as Exhibit "B" and "D".**  California Department of Rehabilitation Staff Psychologist have recognized this in the Psychological Assessment issued for the Board hearing.  **See**

**Psychologist Report.** Petitioner has developed a great deal of insight into his commitment offense and the reasons for his past behavior. **See Exhibit "C".**

4. **MOTIVATION FOR CRIME.** The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time. 15 CCR §2281d)(4).

In spite of being raised in a good home by his mother and father, Petitioner was without the presence of his father from a age 14 after his parents divorced which had a devastating affect upon him and subsequently started associating with a delinquent peer group and suffered his first arrest at age 14 and continued to get in trouble with the law until age 20 when he was arrested for the present crime.

Today, Petitioner is a mature older man of forty four (44) years old who leads a principled life and who looks forward to the day that he can embrace his mother, father, son, brother, sisters and loved ones and become a full-time family man. Petitioner also has many friends who eagerly await his release and who are ready to support him.

5. **BATTERED WOMAN SYNDROME.** At the time of the commission of the crime, the prisoner suffered from battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization. 15 CCR §2281 (d)(5).

Not Applicable.

6. **LACK OF CRIMINAL HISTORY.** The prisoner lacks any significant history of violent crimes. 15 CCR §2281 (d)(6).

Petitioners criminal history does not include several incidents where his actions resulted in injury to others besides the present offense.

7. **AGE.** The prisoner present age reduces the probability of recidivism. 15 CCR §2281(d)(7).

14.

Petitioner has twenty five (25) years in prison; he is now forty four (44) years old. Petitioner's age indicates that there is minimal likelihood that he would commit further crime. The most recent Psychological Assessment concludes that Petitioner's level of dangerousness is a low risk of dangerousness.

8. **UNDERSTANDING AND PLANS FOR FUTURE.** The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. 15 CCR §2281(d)(8).

Petitioner has obtained vocational trades since his incarceration, has a place of residence with his mother and other family members and it appears that Petitioner has maintained a strong family support system. See Exhibit "A", "B" and "C".

9. **INSTITUTIONAL BEHAVIOR.** Institutional activities indicate an enhanced ability to function within the law upon release. 15 CCR §2281(d)(9).

Petitioner does have a minor disciplinary record, however, he has never been cited for any violent acts over his twenty five years of incarceration. Petitioner has been a dedicated and effective worker since his incarceration, receiving outstanding work supervisors reports. In addition he has certificates for participation in self-help programs. His excellent job performance and work ethic attest to the probability of his success upon release and therefore substantially reduce his chances of recidivism.

B. **CIRCUMSTANCES TENDING TO SHOW UNSUITABILITY.**

1. **COMMITMENT OFFENSE.** The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: (a) Multiple victims were attacked, injured or killed in the same or separate incidents; (b) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (c) The victim was abused, defiled or mutilated during or after the offense; (d) The offense was carried out in a manner which demonstrates an

exceptionally callous disregard for human suffering; and (e) The motive for the crime is inexplicable or very trivial in relation to the offense.  15 CCR §2281(c)(1).

Petitioners commitment offense is a serious crime to be sure, however, it was not of such character as to rise to the level of **"especially cruel and callous, dispassionate and carried out in a manner that demonstrates an exceptional callous disregard for human suffering"** as analyzed under the Board's guidelines and the most recent ruling in **In re Scott,** (2004) 119 Cal. App. 4th  871, 891.  The crime of Petitioner involved only one victim being killed.   The victim was not tortured. Lastly, the motive for the crime.   The motive was not inexplicable or very trivial; for example, an outrageous response to a trivial act.  Petitioner is not a loose cannon.

The murder here, as compared to others, was not particularly egregious.  **See In re Scott, supra.**  It should also be noted that the longer an inmate remains incarcerated, increasingly, less emphasis should be placed on factors such as this, because this factor will forever remain unchanging.  This was Petitioners third (3rd) subsequent parole consideration hearing.  Petitioner has served the statutory minimum eligibility of sixteen years  and has served the twenty year  minimum maximum according to the Matrix range.   Petitioners minimum eligible release date was on January 21, 2000.  In the **In re Scott** case he only served 18 years and was found suitable in 2004 when he had served 16 years on a Second Degree Murder.   Petitioner has served 25 years on a 25 year to life sentence.   Petitioner contends that the Board of Parole Hearings are failing to adhere to the Uniformity Clause of Penal Code Section 3031.

2.  PREVIOUS RECORD OF VIOLENCE.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.  15 CCR §2281(c)(2).

See sections A.1 and A.6, above.

3.   **UNSTABLE SOCIAL HISTORY.**   The prisoner has a history of unstable or tumultuous relationships with others.   15 CCR §2281(c)(3)

See section A.1, above.

4.   **SADISTIC SEXUAL OFFENSES.**   The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.   15 CCR §2281(c)(4).

Not applicable.

5.   **PSYCHOLOGICAL FACTORS.**   The prisoner has a lengthy history of severe mental problems related to the offense.   15 CCR §2281(c)(5)

No history of mental problems.   Petitioners commitment offense is not at all related to a psychiatric disorder.   **See attached Psychological report.**

6.   **INSTITUTIONAL BEHAVIOR.**   The prisoner has engaged in serious misconduct in prison or jail.   15 CCR §2281(c)(6).

Petitioner has had disciplinary offenses while incarcerated and 128's counseling chronos over the pass twenty five years.   Petitioner have never been in a riot and have never had a District Attorney referral.   Petitioner's record indicates a de-escalating pattern of administrative violations as the pass eight years of being disciplinary free demonstrates.

/

/

/

/

/

/

/

PETITIONER'S LIFE SENTENCE HAS BEEN ALTERED BY THE BOARD
TO RESEMBLE A SENTENCE OF LIFE WITHOUT THE POSSIBILITY
OF PAROLE OR DEATH, THUS CONSTITUTES AN
EX-POST FACTO APPLICATION OF THE LAW

V.

Indeed, a first degree murder must be "heinous, atrocious or cruel", if, as here, the offense is to serve as the basis for parole denial. 15 Cal. code Regs. §2402(c)(1). In addition, in such cases, the prisoner must **presently** present a danger to society. Cal. Penal Code §3041(b). In short, in the present case, the circumstances surrounding the crime or the manner in which it was committed must show not only that the murder at issue was more cruel or vicious than the ordinary first degree murder and that Petitioner would likely pose a current risk to public safety if released. The record in the case before the Court contains absolutely **no** evidence that would meet **either** of the two requirements. Thus, there can be little doubt that the Board violated the applicable rules when it denied to Petitioner parole solely on the basis of his commitment offense.

Petitioner contends that the jury nor the Sentencing Court found that Petitioner committed an **"especially cruel, callous, dispassionate murder and had an exceptionally callous disregard for human suffering."**

Petitioner contends that in 1983 when Petitioner committed the present crime Penal Code §187 and §190 did not include the crime of first degree murder being committed in an **"especially cruel and callous manner, dispassionate manner and that petitioner's offense demonstrated an exceptional callous disregard for human suffering.** Penal Code §§187/190.1 special circumstances is more fitting to the Board identifying the nature of Petitioner's crime being of such magnitude to deny setting a parole release date based upon the nature of the crime as the Board Transcripts describe.

Penal Code §190.2 (14)(a) which also include the death penalty and

facts not found true in Petitioner's case. For the Board to find the nature of Petitioner's crime to be justified to deny parole falls under BPT rules §2281(c)(1) which includes special circumstances provisions and language that Petitioner was not convicted of nor facts found by a Judge or jury. Such retrospective application of the BPT/DSL regulations increased Petitioner's sentence to life without the possibility of parole without affording to Petitioner Due Process or the process that is due to a trial by jury. Penal Code §190.2 (14) states in pertinent part:

The murder was **especially** heinous, atrocious, or cruel.

Likewise, the BPT/DSL regulations enacted on June 28, 1979, pursuant to BPT §2281(c)(1) also states:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner.

Petitioner suffers from a first degree murder conviction which carries a twenty five years to life sentence with the possibility of parole after serving 16 years and 8 months. Discounting earned good time/work time credits Petitioner has exceeded the minimum maximum suggested base term for his sentence as established by the Board's Parole Matrix by a minimum of eight (8) years. Petitioner has reached the maximum suggested base term of 25 years excluding his good time/work time credits.

Petitioner contends that California's Legislature promulgated Penal Code § 3041 subdivisions (a)(b) and Penal Code §3031 mandating proportionality and uniformity in the actual amount of time served by prisoners convicted of murder. Accordingly, the question of proportionality should not be ignored by the Board or this Court. In response to the Legislature's promulgation of Penal Code §3041 the Board amended §2402(c) to their regulations which established a matrix, which codifies the more commonplace variations of murder.

The matrix also quantifies the various circumstances and victim considerations on a scale which assigns increasing terms of punishment based on increasing severity. The very existence of the matrix demonstrates that different instances of murder be, and must be meaningfully compared. See California Code of Regulations Title 15 §2403(c).

Petitioner contends that each life prisoner is given a "minimum term" to be served by law, which is authorized by the California State Legislature. This begins the process, whereby certain provisions and guidelines comes into affect once the minimum term is completed. **People v. Wingo**, 1975 14 C. 3d 639, and People v. Superior Court (Romero) D.A.R. 7555.

Petitioner contends that when there is a minimum term, the maximum must also exist, and the phrase "LIFE" does not mean until a prisoner dies in prison. This is due to the maximum term being already established by law, and under the law, no term or phrase can be used "where a person of common sense must guess at it's meaning or interpretation." Such interpretation constitutes "cruel and unusual punishment". A person sentenced to "DEATH" knows what this term means under the law. A person sentenced to "LIFE WITHOUT THE POSSIBILITY OF PAROLE" knows that they will never be paroled, unless his or her sentenced is commuted or pardoned by the Governor of the State of California.

Petitioner contends that a person sentenced to "LIFE" is denied Equal Protection of the laws, because the state legislature authorized the parole authority to use provisions to establish the punishment of each prisoner. Instead of **Fixing it"** as defined by law. Enhancement are for the courts to fix, and the Parole Authority to review for disparity against Petitioner's primary term and somewhat minimum or maximum term in prison – minus good time and other credits to reduce Petitioner's sentence. See Penal Code §5057.

Petitioner contends that in the case of the Board, when examining

the crime for the purpose of analyzing suitability, they must engage in an identical comparative process before citing the circumstances of the crime as a factor of unsuitability. Penal Code §3031. As stated by the California Court of Appeal, one must "weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the crime or crimes." See In re Ramirez, (2001) 94 Cal. App. 4th 549, 570.

The Board totally ignored the existence of the matrix in their use of Petitioner's crime as the primary purpose for finding him unsuitable for parole. By labeling the crime "**especially cruel and callous, carried out in a very dispassionate manner and carried out in a manner that demonstrates an exceptional callous disregard for human suffering and pointed out that the cause of the crime was very trivial**" and based upon this finding the board declared that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The Board seeks to justify their decision to retain Petitioner in prison. Such position defines the legislative mandate to normally set terms, and to set terms in an uniform and proportionate manner. Penal Code §3031.

> It is a well-established rule of statutory construction that when a word or phrase has been given a particular scope of meaning in one part or portion of a law it shall be given the same scope and meaning in other parts or portions of the law." **People v. DeGuzman** (2003) 113 Cal. App. 4th 538, 547-548 citing **People v. McKay** (2002) 27 Cal. 4th 601, 621.

Since it is clear that within one part of the statutory scheme governing parole there is a mandated framework for quantifying the severity of any given instance of murder, it seems equally clear that the Board has to be precluded from adopting contrary standards for similar and related parts of the same scheme. It is contrary to both common sense, and the apparent legislative intent, that the Board would be allowed to examine a crime that falls within

21.

the terms contained on the matrix and seems to speak directly to Petitioner's facts, and characterize it as being so exceptionally egregious as to invoke the exception to the rule that the Board **"Shall normally"** set a parole date . . . . Not once, but on three different appearances before the Board after serving the minimum statutory requirement of sixteen (16) calendar years.

Petitioner contends that because there is no lawful grounds on which his disproportionate sentence has been enacted, he asserts that the excessive period of time he has, and continues to serve beyond the sixteen year statutory minimum and the minimum maximum of twenty five year base term requirement supports the conclusion that the Board has abandon the proper application of statute, case law, and/or regulations governing Petitioner's sentence.

Further, because there appears to be no other lawful explanation of this abandonment of applicable law, Petitioner asserts that the Board seeks to impose upon him, ex-post facto, the greater penalty of life without the possibility of parole under special circumstances. This petition for writ of habeas corpus centers around Petitioner's fourth subsequent parole consideration hearing, each time being denied three years at each parole hearing and the panel refusing to set a release date.

The United States, as well as the California Constitution prohibits the passage and enforcement of ex-post facto laws. This includes laws that increase punishment for a crime after it has been committed. This bedrock principle of American Criminal Justice was established more than two hundred years ago in the case of **Calder v. Bull**, (1778) 3 U.S. [3 Dall.] 368, 390-391.

The interpretation of exactly what is and is not and ex post facto law has been defined and redefined a number of times by the court; the general conclusion being, the ex-post facto clause guards against the "danger that

22.

legislatures might disfavor certain persons after the fact . . . " <u>Garner</u> <u>v. Jones</u>, (2000) 529 U.S. 244, 253. <u>Joseph P. Dyer III v. James Bowlen</u>, No. 04-5478 United States Court of Appeals, Sixth Circuit (2006). Petitioner asserts that the Board Panel's refusal to set his term in accordance with applicable law has created a new application of law resembling, and/or patterned after life without the possibility of parole under special circumstances or a death sentence which is disproportionate to the crime he stands convicted of as demonstrated throughout this petition for writ of habeas corpus and this new application falls within the scope of ex-post facto application of law and is therefore prohibited by the Federal and State Constitution.

/
/
/
/
/
/
/
/
/
/
/
/
/
/

THE BOARDS DECISION CONTRADICT THE ONLY CLEARLY ESTABLISHED FEDERAL
LAW ADDRESSING THE FEDERAL PROTECTIONS FOR INMATES IN THE PAROLE PROCESS

VI.

Petitioner contends that other than rehabilitation, imprisonment of those who are convicted of committing crimes generally serves and is justified by one or more three society goals: [For general background on the alternative rationales for incarceration of convicted offenders as discussed in this opinion, see 1 LaFave, Substantive Criminal Law (2d ed. 2003), section 1.5, pages 36–47, and authorities cited therein.]

(1) retribution – that is, punishment of the offender commensurate with the seriousness of the crime: [This can be viewed as either society's own retribution or society's retribution in behalf of the victims (that is, as a more orderly replacement for personal revenge by the victim or the victim's family). But the same proportionate period of imprisonment can be as easily justified as necessary in order to signify society's concern about the relative seriousness of the crime compared to other criminal acts.]

(2) deterrence of future offenses by the offender and other potential offenders; [Imprisonment for purposes of deterrence is generally deemed justifiable for as long as the maximum statutory term or for as long as is required to persuade the defendant or others who are rational enough to weigh costs and benefits that they would pay a heavy price in loss of freedom should they be convicted and imprisoned for the crime they might be contemplating.]

(3) incapacitation of the offender so he is not free to commit other offenses.

Petitioner contends that when the Legislature sets an indeterminate maximum term with a fixed minimum term, the latter can be viewed as setting the period of imprisonment deemed necessary to satisfy the first two purposes, while the justification for continued imprisonment beyond that fixed minimum depends

24.

on the need for continued incapacitation of the offender. [For purposes of parole, the "fixed minimum" is not necessarily the determinate term specified in the statute in effect at the time the court sentenced the defendant – for example, the twenty five years in the "twenty five years to life" sentence Petitioner received. That minimum can be decreased by credits for time served and good conduct in prison. It also can be increased by application of the "matrix" which sets the minimum period before a prisoner is eligible for parole. This matrix takes account of factors demonstrating the crime the prisoner committed was more or less serious than that bare elements of the commitment offense. Thus, the de facto minimum sentence may be far longer (or sometimes shorter) than the statutory minimum embodied in the determinate element of the sentence – depending largely on the prisoner's relative culpability. This is true in Petitioner's case from the trial Court sentencing Petitioner's minimum at twenty five years to life.]

Petitioner contends that California's sentencing structure in murder cases makes it clear the denial of parole can only be justified by the third of these purposes – the need for further incapacitation of the prisoner. Unless there is an unreasonable risk the parole applicant will re-offend and thus pose a risk to public safety he or she is to be released on parole. Penal Code Section 3041, subdivision(a) and (b). Petitioner contends that the Board failed to properly take account of whether release on parole will impair the retributive or the deterrent value of continued imprisonment at this late stage of the inmate's incarceration. Without doubt, it is clear that Petitioner is being disadvantaged by the application of Board refusing to apply the legislative intent of Penal Code §3041, subdivisions (a) and (b) which provide the Board "shall normally set a parole release date ... that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public" [Penal Code §3041, subdivision (a)] "unless it determines that the gravity of the current

or past convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the **public safety requires a more lengthy period of incarceration.**" [Section 3041, subdivision (b), italics added.

The record before the Court from all of the Psychologist Reports declares that Petitioner is not a threat to public safety and that Petitioner poses no risk to society.

## C O N C L U S I O N

**WHEREFORE,** in support of habeas corpus relief Petitioner rely upon the following cases; **Rosenkrantz v. Marshall** (C.D. Cal. 2006) 444 F. Supp. 2d 1063, 1065, 1070 (where the court found due process violated when the former Board of Prison Terms (BPT) denied parole, as it had before, based solely on the gravity of the commitment offense. The court reasoned in pertinent part: "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances - after nearly two decades of incarceration and half a dozen parole suitability hearings – violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. [Citations.]" (Id. at p. 1084.

Petitioner rely upon **Martin v. Marshall** (2006) 431 F. Supp. 2d at pp. 1040-1042, after serving twenty six years in prison was granted release and stated that Petitioner had exceeded his minimum sentence by approximately six years and found no evidence to support denial of parole by the Governor's reversal of parole grant.

Petitioner rely upon <u>Irons v. Warden of California State Prison</u> <u>Solano</u> (E.D. Cal. 2005) 358 F. Supp. 2d 936 (Irons). <u>Irons v. Carey</u> (9th Cir. 2007) 479 F 3d 658. The court wrote; "[Important] in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole .... The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial." (Ibid.)

Petitioner rely upon <u>Elijah Clay v. A.P. Kane</u>, Central District, CV04-8663-VAO (AJW) (Dec. 21, 2005), a seven to life sentenced prisoner that had served almost thirty years.

Petitioner also rely upon the two most recent Certified for Publication cases of <u>Jeffrey David Elkins</u> from the Court of Appeal, First Appellate District, Division Two, case #A111925 where the board found Elkins suitable and granted a parole date and the Governor reversed and the Court of Appeal set aside the Governor's reversal of the grant of parole based upon the nature of the crime. <u>Elkins</u> is a case for the Court to draw inspiration from. Petitioner also rely upon <u>Bernard John Weider</u>, Cite as 2006 DJDAR 15795. Last, but not least Petitioner rely upon <u>Bair v. Folsom State Prison</u>, 2005 W.L. 2219220, * 12 N.S. (Eastern District Cal. 2005) Report and Recommendation Adopted and life prisoner ordered released and the case of <u>In re Wen Lee</u> on habeas corpus – Court of Appeal Second Appellate District, Case #B188831 [The Governor reversed the Boards recommendation to grant parole for second degree murder and attempted premeditated murder after he shot two people, killing one of them, in a dispute over a debt. The Governor reversed over the nature of the crime. The Court vacated the Governor's decision

and reinstated the parole release order].

Petitioner also rely upon Sandra Davis Lawrence on Habeas from the Court of Appeals, Second Appellant District, Division Seven - Case No. B190874, Filed May 22, 2007. Sandra Davis Lawrence was a seven to life prisoner that served almost 30 years and the Governor denied the granting of a parole date without there being "some evidence" and the Court of Appeals for the Second Appellate District concluded that the Governor's reversal of the Board's fourth recommendation Sandra Davis Lawrence be released on parole is not supported by "some evidence" under either the California or the federal view of what constitutes "some evidence" when courts review parole decisions. The Court granted the Petition and ordered Lawrence to be released forthwith.

Petitioner also rely upon Henry Richard Gray, a 15 years to life prisoner for a Second Degree Murder from a 1980 conviction, case #B197193, filed May 24, 2007 by the Court of Appeals, Second Appellate District, Division Three. The Board found Gray suitable and the Governor reversed, the Court found that the record was not supported by "some evidence" and ordered the Board to release Gray forthwith, citing Smith I, supra, 109 Cal. 4th at page 507; Scott, supra 133 Cal. App. 4th at page 604 and Elkins, supra, 144 Cal. App. 4th at page 503.

Petitioner also rely upon David Barker who was convicted of two counts second degree murder and one count of first degree murder on April 14, 1977. Baker's minimum eligibility date was set at August 25, 1983. The Board denied Barker parole ten times in 1982, 1984, 1986, 1987, 1988, 1991, 1994, 1997, 2000 and, most recently, 2005. The Court of Appeal for the First Appellate District, Division Two, case #A114686 concluded the following;

The crimes Barker committed and for which he was convicted were horrific, resulting in the senseless deaths of three people. Those crimes cannot be excused. Or minimized. At the same time, the system provides for parole

in appropriate circumstances, if the prisoner has met the prerequisites for release. Resolution of those competing considerations led to the conclusion of the Court of Appeal granting Wen-Lee's petition for habeas corpus: "All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record establishes that Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support." (Lee, supra, 143 Cal. App. 4th at p. 1414.)

This, we conclude, describes the record as to Barker as well. Barker's petition for writ of habeas corpus is granted, and the Board is ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Barker no later than July 27, 2007. At that hearing, the Board shall consider evidence of all relevant circumstances identified in its own regulations as tending to show a prisoner suitable for release from prison.

Last but not least is the case of In re Peter George Cooper from the Court of Appeal - First Appellate District, Division Two, case number A116437, a 16 years to life prisoner of a second degree murder conviction of his wife in 1987, who served 20 years after brutally murdering his wife with a sledgehammer for calling him a "queer". The Court of Appeal concluded the following in the Cooper case;

In the present case, however, we have concluded that no evidence supported the Governor's finding that the crime was heinous or callous. The record establishes that Cooper does not pose an unreasonable risk to public safety and any contrary conclusion lacks any evidentiary support. We have the entire record that was before the Board and, as stressed above, the Governor's constitutional authority is limited to a review of the evidence presented to

29.

the Board. (See, e.g. Smith I, supra, 109 Cal. App. 4th at p. 507.) Our review indicates that there is no evidence to support a decision other than the one reached by the Board and therefore a remand to the Governor in this case would "amount to an idle act." (Ibid.) Accordingly, we order that Cooper immediately be released on his parole.

Petitioner contends that his first degree murder doesn't come close to any of the supporting cases he has cited and for all of the foregoing reasons the petition for writ of habeas corpus must be granted and;

1. ORDER to Show Cause issued.

2. Appoint Counsel to represent Petitioner.

3. Set an Evidentiary Hearing Date.

4. Order the immediate discharge of Petitioner.

5. Grant any other relief the Court deems appropriate and proper.

I swear under the penalty of perjury that all of the information in this petition is true, correct and complete and to those matters stated on information and belief, I believe them to be true.

DATED: August 22, 2008

Respectfully submitted,

Mr. Harry Cooks

Harry Cooks,
Petitioner In Pro Se/

30.

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    _____

5    (SEE CASES CITED WITHIN ARGUMENT)

6    _____

7    Do you have an attorney for this petition?          Yes_____     No  X

8    If you do, give the name and address of your attorney:

9        Petitioner request the appointment of counsel

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on ___Aug. 22  2008___          x _~Al~ Hurry Cooks_____

14              Date                              Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28                                    31.

PET. FOR WRIT OF HAB. CORPUS

# PROOF OF SERVICE BY MAIL

## BY PRISONER "IN PRO PER"

I hereby certify that I am over the age of 18 years of age, that I am representing myself, and that I am a prison inmate.

My prison address is:    California State Prison - Solano
Housing: 15-L-1-L
P.O. Box 4000
Vacaville, California 95696-4000

On the "*date*" specified below, I served the following document(s) on the parties listed below by delivering them in an envelope to prison authorities for deposit in the United States Mail pursuant to the "Prison Mailbox Rule":

Case Name: COOKS V. SISTO                    Case #: _____

Document(s) Served: 1 original copy of Federal Petition for Writ of Habeas Corpus, 1 face sheet marked, "Please return conformed copy," 1 self-addressed stamped envelope, attached Exhibits, and 1 check for $5.00 for filing fee:

The envelope(s), with postage fully pre-paid or with a prison Trust Account Withdrawal Form attached pursuant to prison regulations, was/were addressed as follows:

**CLERK OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE, BOX 36060
SAN FRANCISCO, CA 94102**

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on **August 22, 2008** , in Vacaville, California.

"*date*"

Signature: *Mr. Harley Cooks*

Printed Name: *MR. HARRY COOKS*

BOARD HEARING TRANSCRIPTS

E X H I B I T   " A "

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life          )       CDC Number:   C-84354
Term Parole Consideration          )
Hearing of:                        )
                                   )
HARRY COOKS                        )       **INMATE COPY**
_____)

CALIFORNIA STATE PRISON, SOLANO

VACAVILLE, CALIFORNIA

August 8, 2007

14:09 P.M.

PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
B. J. Moore, Deputy Commissioner

OTHERS PRESENT:

Harry Cooks, Inmate
Candice Christensen, Attorney for Inmate
Jill Klinge, Deputy District Attorney
(1) Unidentified Correctional Officer

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Emilie J. Howard, WPU Inc

# I N D E X

| | Page |
|---|---|
| Proceedings............................................. | 3 |
| Case Factors........................................... | 14 |
| Pre-Commitment Factors................................ | 16 |
| Post-Commitment Factors............................... | 25 |
| Parole Plans.......................................... | 54 |
| Closing Statements.................................... | 71 |
| Recess................................................ | 83 |
| Decision.............................................. | 84 |
| Adjournment........................................... | 92 |
| Transcript Certification.............................. | 93 |

1 <u>P R O C E E D I N G S</u>

2     **DEPUTY COMMISSIONER MOORE:** Mr. Cooks, good

3 afternoon.

4     **INMATE COOKS:** Good afternoon.

5     **PRESIDING COMMISSIONER BRYSON:** Good afternoon.

6 We are on the record and this is the third Subsequent

7 Parole Consideration Hearing for Harry Cooks, CDC number

8 C-charles-84354. Today's date is August 8th, 2007 and

9 the time is 14:09. We're located at California State

10 Prison Solano. This inmate was received April 18th of

11 1984 from Alameda County. The life term began April

12 18th of 1984 with a minimum eligible parole date of

13 January 21st, 2000. Charging in case number 77583 count

14 one, the controlling offense Penal Code 187 murder

15 first, for which the inmate received a term of 25 years

16 to life. This hearing is being recorded. For the

17 purpose of voice identification, each of us will state

18 our first and last name, spelling the last name. When

19 it is your turn sir, after you spell your last name,

20 please state your CDC number. I'll start and go to my

21 left. Sandra Bryson, B-R-Y-S-O-N Commissioner, Board of

22 Parole Hearings.

23     **DEPUTY COMMISSIONER MOORE:** Hi, I am Deputy

24 Commissioner Moore, M-O-O-R-E, with the Board of Parole

25 Hearings.

1    INMATE COOKS: Harry Cooks C-84354, Cooks C-O-O-

2    K-S.

3    ATTORNEY CHRISTENSEN: Candice Christensen C-H-

4    R-I-S-T-E-N-S-E-N, Attorney for Mr. Cooks.

5    DEPUTY DISTRICT ATTORNEY KLINGE: Jill Klinge, K-

6    L-I-N-G-E, Deputy District Attorney, Alameda County.

7    DEPUTY COMMISSIONER MOORE: And I note for the

8    record we have a correctional peace officer in the room

9    who is here for security purposes, yes.

10    PRESIDING COMMISSIONER BRYSON: And Mr. Cooks,

11    I'm going to have to encourage you to speak up. That

12    doesn't amplify your voice, it only records it. And

13    although I was able to hear it, I had to strain a little

14    so I will ask you; when you do speak that you use a

15    louder voice.

16    INMATE COOKS: Yes, ma'am.

17    PRESIDING COMMISSIONER BRYSON: Louder than that.

18    INMATE COOKS: Okay.

19    PRESIDING COMMISSIONER BRYSON: Louder than that.

20    INMATE COOKS: Yes.

21    ATTORNEY CHRISTENSEN: Use your outdoor voice.

22    DEPUTY COMMISSIONER MOORE: There you go, and

23    sir, I need to swear you in, would you raise your right

24    hand please. Do you solemnly swear or affirm that the

25    testimony you give at this hearing today will be the

1  truth the whole truth and nothing but the truth?

2          INMATE COOKS:  Yes.

3          DEPUTY COMMISSIONER MOORE:  Thank you.

4          PRESIDING COMMISSIONER BRYSON:  I need four bars.

5  Thank you.

6          INMATE COOKS:  Yes.

7          PRESIDING COMMISSIONER BRYSON:  Thank you.

8          INMATE COOKS:  Okay.

9          PRESIDINC COMMISSIONER BRYSON:  Commissioner

10  Moore, is there any confidential material in the file

11  and if so, will it be used today?

12          DEPUTY COMMISSIONER MOORE:  There is confidential

13  material, but it does not appear relevant today.

14          PRESIDING COMMISSIONER BRYSON:  All right.  I'm

15  passing the hearing checklist marked Exhibit one to the

16  District Attorney and then to your attorney to ensure

17  that we're all proceeding with the same set of documents

18  and when you're ready Ms. Klinge, do you have the

19  documents?

20          DISTRICT ATTORNEY KLINGE:  I do.

21          PRESIDING COMMISSIONER BRYSON:  And when you're

22  ready Ms. Christensen, do you have the documents?

23          DISTRICT ATTORNEY CHRISTENSEN:  I have them, as

24  well.  Thank you.

25          PRESIDING COMMISSIONER BRYSON:  Thank you.  Are

1    there any additional documents to be submitted?

2         DISTRICT ATTORNEY CHRISTENSEN:  Not a thing.

3         PRESIDING COMMISSIONER BRYSON:  Thank you.  All

4    right sir, would you please read the document in front

5    of you out loud.

6         INMATE COOKS:  The American with Disability Act,

7    ADA, is a law, a law, a law to help peoples with

8    disability, disability or public problems that make it

9    harder for some peoples to see, hear, is that breathe?

10   Breathe, talk with, learn, think with, or take care of

11   themselves than it is for others.  Nobody can be kept

12   out of pu--

13        ATTORNEY CHRISTENSEN:  Public.

14        INMATE COOKS:  --public places or attend

15        ATTORNEY CHRISTENSEN:  Activities.

16        INMATE COOKS:  --activities or activities because

17   of a disability.  If you have a disability, you have the

18   right to ask for help to get ready for your Board or

19   parole hearing, BPH hearing, get to the hearing, talk,

20   read forms and prepare papers, and understand the

21   hearing process.  BPH will look at what you ask for to

22   make sure that you have a disability that is covered by

23   the ADA and that you have asked for the right kind of

24   help.  If you do not get help, or if you don't think you

25   got the kind of help you need, ask for a BPH 1074—what's

1   that um--

2         **ATTORNEY CHRISTENSEN:** Grievance.

3         **INMATE COOKS:** --grievance form. You can also

4   get help to fill it out.

5         **PRESIDING COMMISSIONER BRYSON:** And sir, do you

6   understand what you read?

7         **INMATE COOKS:** Yes, ma'am.

8         **PRESIDING COMMISSIONER BRYSON:** All right sir.

9   On, the record reflects that on April 16th of 2007 you

10   signed BPT form 1073, the reasonable accommodation

11   notice and request. In accordance to the provision to

12   the Americans with Disabilities Act. Disability as

13   defined under the ADA. And sir, I believe there were

14   some issues back in 2005 where you had to use a cane for

15   a while. Is that correct?

16         **INMATE COOKS:** Yes. I had um--

17         **PRESIDING COMMISSIONER BRYSON:** Did you have an

18   injury or something? Or--

19         **INMATE COOKS:** --yes, I didn't have no iron in my

20   blood and my vitamins was low from working out and my

21   body collapsed on me, just shut down. I went out to the

22   hospital for almost 72 hours. That was it.

23         **PRESIDING COMMISSIONER BRYSON:** Okay.

24         **INMATE COOKS:** But they gave me iron pills and

25   everything. I didn't have serious injuries. No

1   injuries occurred.

2         **PRESIDING COMMISSIONER BRYSON:** Okay. So you've

3   recovered from that?

4         **INMATE COOKS:** Yes, ma'am.

5         **PRESIDING COMMISSIONER BRYSON:** Well you look

6   like you're in excellent health.

7         **INMATE COOKS:** Thank you.

8         **PRESIDING COMMISSIONER BRYSON:** Well you're

9   welcome. Um, we also show that aside from that, we have

10   no disabilities identified from the file review. I do

11   notice you wear glasses. Do they accommodate you for

12   reading?

13         **INMATE COOKS:** Yes.

14         **PRESIDING COMMISSIONER BRYSON:** Okay. You don't

15   appear to have any hearing difficulties. Is that

16   correct?

17         **INMATE COOKS:** Yes.

18         **PRESIDING COMMISSIONER BRYSON:** Okay. And you

19   didn't appear to have any motility issues getting to the

20   hearing room. Is that correct?

21         **INMATE COOKS:** Yes, ma'am.

22         **PRESIDING COMMISSIONER BRYSON:** Okay. Have you

23   ever been involved in the triple-CMS or EOP programs?

24         **INMATE COOKS:** No, ma'am.

25         **PRESIDING COMMISSIONER BRYSON:** Have you ever

1    taken psychotropic medication, either in prison or on

2    the street?

3            INMATE COOKS:  No.

4            PRESIDING COMMISSIONER BRYSON:  Okay.  Um, we

5    also note that um, this is somewhat dichotomous.  We

6    have on this 1073 form that you have a reading level of

7    12.9 and a total GPL of 5.7.  We note that you did in 8

8    of 1998, in August, you were evaluated to have a 2.9 TAV

9    score and in March of 1999 you were evaluated to have a

10   3.2 TAV score.  But now you have a GPL, or at least for

11   this form, you have a GPL of 5.7.  So there's some

12   disjunctiveness here um and we don't know what that is.

13   Did you ever get your GED, sir?

14           INMATE COOKS:  Yes.  They said um, the paper I

15   went on when I first arrived here in classification

16   here; it was some kind of discrepancy about the form, I

17   guess.  I'm not sure exactly what it was.  And I took it

18   and I'm not sure recall, can't recall what year it was

19   at DVI but they determined later on that I have dyslexia

20   and that could have been some other, other than that I

21   have no idea.

22           PRESIDING COMMISSIONER BRYSON:  All right.  Now,

23   did you ever attain your GED?

24           INMATE COOKS:  At DVI.

25           PRESIDING COMMISSIONER BRYSON:  At DVI?

10

1        INMATE COOKS:  Yes, ma'am.

2        PRESIDING COMMISSIONER BRYSON:  Okay.  Do you

3    recall anything close to the year that was, so that we

4    can search for it in your file?

5        INMATE COOKS:  I believe it was like, around 95'

6    or 96', somewhere around there.

7        PRESIDING COMMISSIONER BRYSON:  Okay.  Okay.

8    Other than that there, other than ones I have

9    identified, there are no other disabilities identified

10   from the file review.  Um, so it does not appear, and I

11   will ask you to confirm, do you suffer from any

12   disability that could prevent you from participating in

13   today's hearing?

14       INMATE COOKS:  No, ma'am.

15       PRESIDING COMMISSIONER BRYSON:  All right.  And

16   counselor, do you concur?

17       ATTORNEY CHRISTENSEN:  Yes I do.

18       PRESIDING COMMISSIONER BRYSON:  All right, thank

19   you.  This hearing is being conducted pursuant to Penal

20   Code sections 3041 and 3042.  And the rules and

21   regulations of the Board of Parole Hearings governing

22   parole consideration hearings for life inmates.  The

23   purpose of today's hearing is to consider your

24   suitability for parole.  In doing so, the Panel will

25   consider the number and nature of the crimes for which

1  you were committed, your prior criminal and social

2  history, and your behavior and programming since your

3  commitment.  The Panel has had the opportunity to review

4  your Central File.  You will be given the opportunity to

5  correct or clarify the record.  The Panel will consider

6  your progress since your commitment, your Counselor's

7  reports, psychological report, and any other relevant

8  information.  Any change in parole plans should be

9  brought to the Panel's attention.  The Panel will reach

10 a decision today and inform you whether or not it finds

11 you suitable for parole and the reasons for its

12 decision.  If you're found suitable for parole, the

13 length of your confinement will be explained to you.

14 Nothing that happens here today will change the findings

15 of the court.  The Panel is not here to retry your case.

16 The Panel is here for the sole purpose of determining

17 your suitability for parole.  Do you understand?

18          INMATE COOKS:  Yes, ma'am.

19          PRESIDING COMMISSIONER BRYSON:  This hearing will

20 be conducted in three phases.  I will discuss with you

21 the crime for which you were committed, your prior

22 criminal and social history.  Commissioner Moore will

23 discuss with you your progress since your commitment,

24 your Counselor's reports, and your psychological

25 evaluation.  I will then discuss with you your parole

WPII Inc

1    plans and any letters of support or opposition that may

2    be in the file.  Once that is concluded, the Panel and

3    then the District Attorney, and then your attorney will

4    be given the opportunity to ask you questions.

5    Questions from the District Attorney shall be asked

6    through the Chair and you'll direct your answers to the

7    Panel.  Next, the District Attorney, and then your

8    attorney and then you, will be given an opportunity to

9    make a final statement regarding your parole

10   suitability.  Your statement should address why you feel

11   you are suitable for parole.  The Panel will then

12   recess, clear the room, and deliberate.  Once the

13   deliberations are completed, the Panel will resume the

14   hearing and announce its decision.  The California Code

15   of Regulations states that regardless of time served, a

16   life inmate shall be found unsuitable for and denied

17   parole if, in the judgment of the Panel, the inmate

18   would pose an unreasonable risk of danger to society if

19   released from prison.  You have certain rights.  Those

20   rights include the right to a timely notice of this

21   hearing.  Were you given timely notice of this hearing

22   sir?

23        INMATE COOKS:  Yes.

24        PRESIDING COMMISSIONER BRYSON:  The right to

25   review your Central File.  I believe you reviewed your

13

1  Central File April 16th of 2007, is that correct?

2      **INMATE COOKS:**  Yes, ma'am.

3      **PRESIDING COMMISSIONER BRYSON:**  Okay.  The right

4  to present relevant documents, which we've already

5  discussed.  And you also have the right to be heard by

6  an impartial panel.  Do you have any evidence that the

7  Panel before you cannot be impartial sir?

8      **INMATE COOKS:**  No.

9      **PRESIDING COMMISSIONER BRYSON:**  Okay.  You will

10  receive a copy of the Panel's written tentative decision

11  today.  That decision will become effective within 120

12  days.  It is also subject to review by the Governor.  A

13  copy of the tentative decision and a copy of the

14  transcript will be sent to you.  The Board has

15  eliminated its appeal process.  If you disagree with

16  anything in today's hearing, you have the right to go

17  directly to the court with your complaint.  You're not

18  required to admit your offense or discuss your offense

19  if you do not wish to do so.  However, this panel does

20  accept as true the findings of the court.  And you're

21  invited to discuss the facts and circumstances of the

22  offense if you desire.  The Board will review and

23  consider any prior statements you've made regarding the

24  offense in determining your suitability for parole.  So

25  basically it's quite simple, just tell the truth.  Are

14

1  there any preliminary objections, Counsel?

2       ATTORNEY CHRISTENSEN:  No, there's not.

3       PRESIDING COMMISSIONER BRYSON:  Will the inmate

4  be speaking with the Panel?

5       ATTORNEY CHRISTENSEN:  He's not going to be

6  discussing the crime um; he's always denied his guilt.

7  He's always denied his guilt in this case.

8       PRESIDING COMMISSIONER BRYSON:  All right.  I

9  will ask you Counsel, um, he did at some point um, admit

10  to receiving stolen property.  Is he still admitting to

11  that?

12       ATTORNEY CHRISTENSEN:  That's correct.

13       PRESIDING COMMISSIONER BRYSON:  All right.  And

14  would he represent that what he stated in the most

15  recent Board Report that is of June 12th, 2007, is

16  correct?

17       ATTORNEY CHRISTENSEN:  That's correct.  He has a

18  copy of that.  Um-hum.

19       PRESIDING COMMISSIONER BRYSON:  All right.  All

20  right then I shall read into the record the offense

21  summary as taken from the probation officer's report,

22  pages 3 and 4.  And this is entered into the current

23  Board Report, as I mentioned of June 12th, 2007.  This

24  was prepared by J. Mitzel, M-I-T-Z-E-L, Correctional

25  Counselor I.  The following summary of the offense was

1    submitted by Charles E. Fraser, F-R-A-S-E-R, Senior

2    Deputy District Attorney.

3           "On August 11th, 1983, Harry Cooks and

4        some other associates strangled 64-years-old

5        (sic) Edgar Ellis, E-L-L-I-S, and ransacked his

6        person and home.  We note that Edgar Ellis was

7        a 64-year-old male.  Taking his safe, money,

8        marijuana and stereo equipment, he was

9        identified in the home controlling the victim

10       before the murder, and later on the steps

11       leaving the home.  He bragged to two separate

12       witnesses about participating in the

13       robbery/murder.  A search warrant on his home

14       turned up a reel-to-reel tape recorder taken in

15       the robbery.  The autopsy results showed

16       numerous injuries to the victim consistent with

17       a protracted beating.  The sweater used to

18       strangle the victim could well have been used

19       to coerce information about the location of

20       money and drugs, as well as the combination of

21       the safe, which was ultimately removed from the

22       house."

23    And as to the prisoner's version,

24        "The defendant discussed the offense, but did

25        not submit a written statement.  He admitted

accepting stolen property but denied committing
murder. He stated that he did not know the
victim personally, but he knew from individuals
on the street that he sold marijuana. The
evening of the offense, he left the home of a
friend and was walking by the victim's house
when he saw some people on the stairs including
a Charles, who called him over and asked him if
he wanted a reel-to-reel tape. He took the
tape knowing it was probably stolen, but didn't
give it much thought. He then went to a
friend's house and spent the night. He stated
that the jewelry found in his house had gotten
(sic) through trading marijuana. He added that
if he had stolen items from the defendant he
would have had more than a reel-to-reel tape in
his home. He stated that he would not
voluntarily accept a deal because he was not
guilty. He decided that they would have to
find him guilty and give him time. He believed
the witnesses lied, but since he has been
convicted he will do his best to keep his mind
and body healthy while incarcerated and look
forward to getting out and being with his
family."

17

1          And, sir, going over your criminal history, you

2     were 17 years of age when first arrested on April 10th,

3     1980 by Oakland Police Department for burglary.  Um, you

4     were granted probation for the offense on June 25th of

5     1980.  Then on May 17th of 1980 you were arrested by

6     Oakland Police Department for petty theft.  This matter

7     was dismissed.  And you were dismissed from juvenile

8     probation on June 12th of 1981.  As to your adult

9     convictions and arrests, this is all per the probation

10    officer report.  Adult convictions and arrests:  you

11    were convicted of burglary on June 29th, 1982 and were

12    sentenced to 12 months court probation and 180 days jail

13    suspended.  You were convicted on June 24th, 1982 for

14    possession of less than an ounce of marijuana, serving

15    three days county jail.  Then you were convicted just a

16    couple of months later on August, oh, I'm sorry, over a

17    year later, on August 8th of 1983 for possession of more

18    than an ounce of marijuana and sentenced to 18 months

19    court probation, six months county jail suspended and a

20    one hundred dollar fine.  And so, at the time of the

21    commitment offense, the inmate was still on probation

22    and I would note for the record that he was 20-years-old

23    at the time of the commitment offense.  And sir, as to

24    your family background, you were born in Alabama, raised

25    in Oakland California.  How did you happen to get from--

1  how did you get from Alabama to Oakland?  How did that

2  happen?

3       INMATE COOKS:  Well, we moved to Oakland

4  California when I was about five years old.

5       PRESIDING COMMISSIONER BRYSON:  Oh really.  Okay.

6  You're the third of five sons born to, is that Flemming

7  (spelled phonetically) and Melvina (spelled

8  phonetically) Cooks?

9       INMATE COOKS:  Yes, ma'am.

10       PRESIDING COMMISSIONER BRYSON:  All right.  You

11  moved to Oakland in the late sixties.  Your father

12  obtained work as a welder and continued to provide

13  financial support for the family following his divorce

14  in 1976.  Um, so in 1976 you were about 13-years-old, is

15  that correct?

16       INMATE COOKS:  Yes, ma'am.

17       PRESIDING COMMISSIONER BRYSON:  Was that hard on

18  you whenever your parents got divorced?

19       INMATE COOKS:  Yes.

20       PRESIDING COMMISSIONER BRYSON:  Oh my.  Um, do

21  you still have your father today?

22       INMATE COOKS:  Yes.

23       PRESIDING COMMISSIONER BRYSON:  How is he doing?

24       INMATE COOKS:  Not well, he's back in Alabama

25  about three years now and going in and out of the

19

1   hospital.

2          **PRESIDING COMMISSIONER BRYSON:**  I'm sorry.

3   What's your relationship with your father or what has it

4   been then through the years?

5          **INMATE COOKS:**  It's been good.

6          **PRESIDING COMMISSIONER BRYSON:**  Has it?

7          **INMATE COOKS:**  Yeah, we still correspond and I

8   write and call from time to time.

9          **PRESIDING COMMISSIONER BRYSON:**  Good enough, all

10  right.  How did he treat you as a young--when you were a

11  young lad?

12         **INMATE COOKS:**  Well.

13         **PRESIDING COMMISSIONER BRYSON:**  Did he treat you

14  well?

15         **INMATE COOKS:**  Yes.

16         **PRESIDING COMMISSIONER BRYSON:**  All right.  Um,

17  for 17 years while married to his father, your mother

18  was a housewife and then following the divorce she

19  obtained part time work in a laundromat and received

20  AFDC.  She's presently disabled and supported by SSI

21  benefits.  How is she doing today?  Is she--

22         **INMATE COOKS:**  She's not doing well, she have um,

23  diabetics and had several surgeries on her eyes.  And

24  one of her feet was half removed--

25         **PRESIDING COMMISSIONER BRYSON:**  Oh boy.

1    INMATE COOKS:  --from high blood pressure and

2 sugar and stuff like that.

3    PRESIDING COMMISSIONER BRYSON:  Um-hum I'm sorry

4 for that.  Um, it says that you and two other brothers

5 resided with your mother prior to the arrest and this

6 indicated that your brother Charles Cooks suffered an

7 arrest for possession of marijuana um.  So how are your

8 brothers today?

9    INMATE COOKS:  Well Charles was killed in 87'.

10 My younger brother Frank, he's okay.  He is taking care

11 of his family in Alameda now.  And my oldest brother

12 Glen, he hasn't been seen since I believe 99' and the

13 FEDS deemed him dead earlier this year.

14    PRESIDING COMMISSIONER BRYSON:  Oh.

15    INMATE COOKS:  And Speedy, he's in Alabama taking

16 care of his family.

17    PRESIDING COMMISSIONER BRYSON:  Speedy?

18    INMATE COOKS:  Yes, that's what we call him.

19 Flemming (spelled phonetically) because he's junior but

20 um--.

21    ATTORNEY CHRISTENSEN:  What's his name?

22    INMATE COOKS:  Flemming, but we call him Speedy.

23    ATTORNEY CHRISTENSEN:  Okay.

24    PRESIDING COMMISSIONER BRYSON:  That's good.

25 Now, you were educated in public schools, you completed

1    the 11th grade at McClymonds High School?

2         INMATE COOKS:  McClymonds.

3         PRESIDING COMMISSIONER BRYSON:  McClymonds High

4    School.  You got so close.  Um, grades were below

5    average, but your attendance and behavior were

6    considered good.  You were described as having artistic

7    ability.  What artistic ability do you have?

8         INMATE COOKS:  Um, I started a company--if I may-

9         PRESIDING COMMISSIONER BRYSON:  Certainly.

10         INMATE COOKS:--yes.  Over the past year or so

11    since I been here, this will be shown later, three video

12    games I created, I have a comic book and then this.

13    Excuse me, while you're going at this place.  It's all

14    that game.  One of them is with a lot of other art work.

15    And then the third one holds three different trades that

16    I have completed at DVI.  Auto body, milling cabinets

17    and upholstery.  The carpentry, they didn't give us any

18    pictures or anything during carpentry because carpentry,

19    helped took care of the institution, repair stuff in the

20    institution.

21         PRESIDING COMMISSIONER BRYSON:  I see, okay.

22    Well we'll be talking about your institutional

23    adjustment in just a moment.  This is pretty awesome.

24    So you have drawing capability, obviously.  Um, we'll be

25    looking at all of this, my goodness.  This is extensive.

22

1   Okay, um, I'll look that over, too.  Um, so they

2   recognized that in high school, actually, right?

3        INMATE COOKS:  Yes, ma'am.

4        PRESIDING COMMISSIONER BRYSON:  That's good.  Um,

5   then you also played football and were on the wrestling

6   team, um, it says that at 18 you attended Merritt Junior

7   College, but dropped out after three semesters due to

8   financial problems.

9        INMATE COOKS:  Yes, ma'am.

10        PRESIDING COMMISSIONER BRYSON:  Now how did you

11   get into college if you didn't finish high school?  How

12   did that work?

13        INMATE COOKS:  It was a walk-on.  You could, when

14   you go to JC, it's a walk-on, you have to take tests and

15   I started the process of doing all my tests and

16   everything as well as playing football and because of

17   financial problems I didn't get a chance to finish it.

18        PRESIDING COMMISSIONER BRYSON:  Okay, um, you've

19   never been married, but you have a son Quentin.

20        INMATE COOKS:  Yes, I was married.

21        PRESIDING COMMISSIONER BRYSON:  Oh, okay, that's

22   an error in the Board Report then.  Okay, um, it says,

23   well okay, you're not married now though, is that

24   correct?

25        INMATE COOKS:  No, ma'am.

23

1    PRESIDING COMMISSIONER BRYSON: Okay, tell me

2    about that marriage, what happened?

3    INMATE COOKS: Well after so much time, my son's

4    mother, she couldn't deal with the situation. Instead

5    of putting her through the stress, I divorced her

6    because of my love for her, I would rather her be happy

7    than unhappy.

8    PRESIDING COMMISSIONER BRYSON: Good for you.

9    Um, but were you, so you were married at the time of

10   this crime? Is that--

11   INMATE COOKS: No, ma'am.

12   PRESIDING COMMISSIONER BRYSON: Oh you weren't.

13   INMATE COOKS: No I--

14   PRESIDING COMMISSIONER BRYSON: Okay, so since

15   you came in here?

16   INMATE COOKS: Yes.

17   PRESIDING COMMISSIONER BRYSON: And you had the

18   child since you came in here.

19   INMATE COOKS: No, he was born in 81'.

20   PRESIDING COMMISSIONER BRYSON: I see, okay, all

21   right. And do you, are you close to him?

22   INMATE COOKS: Yes.

23   PRESIDING COMMISSIONER BRYSON: All right. How's

24   he doing?

25   INMATE COOKS: He's fine, I just talked to him a.

1  couple of days ago and me and his mother still

2  correspond.

3          PRESIDING COMMISSIONER BRYSON:  Okay, all right.

4  It says that he resides with his mother.  Um--

5          INMATE COOKS:  But now he's on his own, he's

6  grown now.  He's 26 now so--

7          PRESIDING COMMISSIONER BRYSON:  Okay, so he's no

8  longer living with his--

9          INMATE COOKS:  No.

10         PRESIDING COMMISSIONER BRYSON:  Oh, okay.  What

11  does he do?

12         INMATE COOKS:  Right now he's just come back from

13  New Orleans so; he was down there working, contractor,

14  during the Katrina storm and he come out here for a

15  vacation.  He's getting ready.  He'll probably leaving

16  in a few months or so, I'm not sure.

17         PRESIDING COMMISSIONER BRYSON:  Go back down

18  there?

19         INMATE COOKS:  Yes, ma'am.

20         PRESIDING COMMISSIONER BRYSON:  Wow, that's a

21  challenge.  All right.  Um, it talks about you worked at

22  odd jobs, um, factory work, um and then just some other

23  information.  You've never served in the military.  Um,

24  we don't have too much of—um, do you spend a lot of your

25  time working on this in here?

25

1    **INMATE COOKS:**  Yes, that and business studies in

2 the building, you know, there's a business plan in there

3 with that, that goes with everything and that's all I do

4 you know, other than work-out, stay in shape the best I

5 can. I put my business plan together.  At DVI presently,

6 at the time when I was at DVI, I had um started a non-

7 profit organization because they had these kids, the

8 straight-life thing, coming up, you know bring the kids

9 in.  So I connected with a couple of churches on the

10 street bringing kids in and stuff like that and then my

11 younger brother Frank, he had a part non-profit

12 organization dealing with the kids as well and I was

13 doing that for a while.  And I would like to continue

14 doing that on the street along with the company funds

15 using that I have put in myself.  You know, to support,

16 you know, to show kids it's a different route than when

17 you feel that it's very hard, it's not as hard as you

18 think.  You know.  That was one, I believe, my downfall.

19    **PRESIDING COMMISSIONER BRYSON:**  I see.

20    **INMATE COOKS:**  Thinking that I had to go out on

21 the street to do things when I didn't have to.

22    **PRESIDING COMMISSIONER BRYSON:**  Well if you'll

23 turn your attention to Commissioner Moore now.  She'll

24 talk about your post incarceration factors.

25   **P O S T - C O M M I T M E N T   F A C T O R S**

1      INMATE COOKS:  Yes.

2      DEPUTY COMMISSIONER MOORE:  May I ask a question?

3      INMATE COOKS:  Yes, ma'am.

4      DEPUTY COMMISSIONER MOORE:  Chubao?

5      INMATE COOKS:  Yes, that's my art name.

6      DEPUTY COMMISSIONER MOORE:  What's it mean?

7      INMATE COOKS:  Precious jewels.

8      DEPUTY COMMISSIONER MOORE:  In what language?

9      INMATE COOKS:   Thai.

10     DEPUTY COMMISSIONER MOORE:  Where did you---how

11 were you exposed to that?

12     INMATE COOKS:  A young man up in um Folsom during

13 the 80's.  We was pretty close associates and um he was

14 artistic, actually would say, liked to draw too and I

15 asked him, how would you say it in his language because

16 I got it from an old song Marvin Gaye, one of Marvin

17 Gaye's songs about precious jewels and I liked that.  In

18 a language you say it, it just sounds a lot better than

19 in the English form of just saying precious jewels.

20 Chubao, it sounds like its deeper so---

21     PRESIDING COMMISSIONER BRYSON:  And for the

22 transcriptionist it's C-H-U-B-A-O.

23     DEPUTY COMMISSIONER MOORE:  Okay.  I'm just going

24 to take a look a little bit more. And what's the word

25 Agbulom?

1        **INMATE COOKS:** Agbulom, that's the name of the

2  company.

3        **DEPUTY COMMISSIONER MOORE:** What's it mean?

4        **INMATE COOKS:** It's one of the names from

5  Africa's motherland. One of the countries over there,

6  over the hundreds of years they been changed you know,

7  so that's one of the older languages, its Swahili but

8  it's one of the oldest names.

9        **DEPUTY COMMISSIONER MOORE:** Who's by G?

10        **INMATE COOKS:** I'm G.

11        **DEPUTY COMMISSIONER MOORE:** Harry Cooks.

12        **INMATE COOKS:** Yes.

13        **DEPUTY COMMISSIONER MOORE:** I'm trying to get the

14  G out of that.

15        **INMATE COOKS:** It was just was a handle that went

16  with that.

17        **DEPUTY COMMISSIONER MOORE:** Is that a nickname

18  that you carried or--

19        **INMATE COOKS:** Yes, Ma'am.

20        **DEPUTY COMMISSIONER MOORE:** And what's your

21  nickname?

22        **INMATE COOKS:** My nickname is Earl. They call me

23  Ghost sometime. That's how the G come about.

24        **DEPUTY COMMISSIONER MOORE:** Okay. All right.

25        **PRESIDING COMMISSIONER BRYSON:** And just again

28

1  for the transcriptionist so she doesn't or he doesn't

2  think, that's the name of the business, A-Q-B-U-L-O-M

3  enterprises.

4      **DEPUTY COMMISSIONER MOORE:**  All right, Mr. Cooks

5  I'm going to review with you most of the focus, what

6  you've accomplished since your last hearing.  And also

7  we'll do some historic stuff because I do know that when

8  you were at DVI it was a fertile time for you to

9  program.

10     **INMATE COOKS:**  Yes.

11     **DEPUTY COMMISSIONER MOORE:**  And there've been

12 some substantial changes since then so I want to give a

13 more broad picture in this hearing so that we cover both

14 DVI and more recent past okay?

15     **INMATE COOKS:**  Yes, ma'am.

16     **DEPUTY COMMISSIONER MOORE:**  Your last hearing was

17 on August 31st, 2005 in which you were denied parole for

18 two years and at that time, and that was held at Folsom

19 is that right?

20     **INMATE COOKS:**  Yes, ma'am.

21     **DEPUTY COMMISSIONER MOORE:**  And at that time the

22 Panel recommended that you remain disciplinary free,

23 seek self help and earn positive chronos.  Does that

24 sound familiar?

25     **INMATE COOKS:**  Yes.

1    **DEPUTY COMMISSIONER MOORE:** Okay. Uh, you um,

2  about nine months after that hearing you were

3  transferred to CSP Solano on May 19th, of 2006.

4    **INMATE COOKS:** Yes.

5    **DEPUTY COMMISSIONER MOORE:** And your

6  classifications changed recently as well as I understand

7  it. Your classification score, you reached 19, just in

8  May um April of this year, which is your mandatory, is

9  the minimum classification score that you can receive.

10  Is that right?

11    **INMATE COOKS:** Yes.

12    **DEPUTY COMMISSIONER MOORE:** And you've been on

13  medium-A custody level since August of 96'. There's an

14  indication under gang affiliation of Crip 415.

15    **INMATE COOKS:** Yes, but I'm neither. And Crip is

16  not anything in the Bay area until just recently and

17  forced my knowledge of watching the news, it's not in

18  the Bay area as far as Oakland but I ain't neither.

19    **DEPUTY COMMISSIONER MOORE:** Okay, what about

20  Kumi, which is another, you see that related with 415

21  frequently.

22    **INMATE COOKS:** Yes, that's, I believe the reason

23  why I was connected and have been connected with that,

24  because the time of period that I came into the system

25  there was no individuals gang as far as affiliation out

1  of Oakland in the system and a lot of young peoples was

2  getting misused and stuff like that.  And a group

3  individual that stood up, there was no way to determine

4  who we was so they start grouping peoples up just

5  because we communicated with each other by association.

6        **DEPUTY COMMISSIONER MOORE:**  Um-hum.

7        **INMATE COOKS:**  And that's the only way I could

8  even begin to accept any form of affiliation.  But if

9  that would be, cause me to be affiliated with anybody

10  it's been several other groups that I been affiliated

11  with by association.

12        **DEPUTY COMMISSIONER MOORE:** So are you familiar

13  with a group, a disruptive group in prison called Kumi

14  or ANO, African Nation Organization?

15        **INMATE COOKS:**  I'm aware of those organizations

16  that you speak of.

17        **DEPUTY COMMISSIONER MOORE:**  And are they active?

18        **INMATE COOKS:**  As a gang, not that I wouldn't say

19  they was a gang.  They individuals that I would

20  communicate with under that.  I wouldn't see them with

21  gang mentality.

22        **DEPUTY COMMISSIONER MOORE:**  Did you come into the

23  institution with the name Ghost or was that a name that

24  came to you after you got here.

25        **INMATE COOKS:**  Into the system with it because

1    when I---

2          DEPUTY COMMISSIONER MOORE:  Came in from the

3    street?

4          INMATE COOKS:  ---used to wrestle and box.  Yes,

5    ma'am.

6          DEPUTY COMMISSIONER MOORE:  Okay.  How'd you get

7    the nickname Ghost?

8          INMATE COOKS:  Through wrestling and boxing.

9    Just was quick and--

10          DEPUTY COMMISSIONER MOORE:  Faster than--

11          INMATE COOKS: ---when I was younger.

12          DEPUTY COMMISSIONER MOORE:  ---some but slower

13    than others?

14          INMATE COOKS:  Yes, ma'am.

15          DEPUTY COMMISSIONER MOORE:  Okay.  Um, now I took

16    a little extra time and went through your C-file.  And I

17    noticed that your classification score, your

18    classification recently changed from C-status to a

19    different status and that you weren't programming for a

20    period of time.  Is that an accurate statement?

21          INMATE COOKS:  Yes.

22          DEPUTY COMMISSIONER MOORE:  And so I—are you on a

23    waiting list now or are you currently working?

24          INMATE COOKS:  I was just given a job docket

25    Friday.

32

1   DEPUTY COMMISSIONER MOORE:  Friday?

2   INMATE COOKS:  Friday just passed.

3   DEPUTY COMMISSIONER MOORE:  Okay, for what?

4   INMATE COOKS:  Um, education.

5   DEPUTY COMMISSIONER MOORE:  Okay.

6   INMATE COOKS:  I requested it for school.

7   DEPUTY COMMISSIONER MOORE:  ABE-two or three?

8   INMATE COOKS:  One of those, I'm not sure, I

9  don't remember.

10   DEPUTY COMMISSIONER MOORE:  It's going to help

11  you because I haven't been able to find a GED in your

12  record.  I found a lot of testing that was done at DVI.

13   INMATE COOKS:  Um-hum.

14   DEPUTY COMMISSIONER MOORE:  They tested you

15  frequently for your reading score and it ranged from

16  2.2, your reading score went higher but your overall

17  with the math and the language kept you at about between

18  the 4th and 7th grade level. So I didn't find any GED.

19  Is that different than your memory of everything or do

20  you just remember being tested a lot?

21   INMATE COOKS:  Yes.

22   DEPUTY COMMISSIONER MOORE:  Okay.  So you're

23  going to be going to education, working towards

24  obtaining a GED or High School Equivalency?

25   INMATE COOKS:  Yes, ma'am.

1    **DEPUTY COMMISSIONER MOORE:**  Okay, good goal.  A

2    necessary goal for you.  Okay?  And with those drawing

3    skills, did someone help you with your business plan?

4    **INMATE COOKS:**  No, I did it myself.

5    **DEPUTY COMMISSIONER MOORE:**  Where'd you type it

6    up?

7    **INMATE COOKS:**  I had somebody type it up after I

8    write it up.  I had somebody go over it and type it up.

9    **DEPUTY COMMISSIONER MOORE:**  Okay.  Did they edit

10   it for you too?

11   **INMATE COOKS:**  Some of it.

12   **DEPUTY COMMISSIONER MOORE:**  Okay.  Okay.  Um, so

13   I don't find anything since 1997 for work.

14   **INMATE COOKS:**  That was, I was placed on C-status

15   in 98' at DVI because of the grooming standards.

16   **DEPUTY COMMISSIONER MOORE:**  Okay.  So from 98'

17   until last Friday--

18   **INMATE COOKS:**  Yes, ma'am.

19   **DEPUTY COMMISSIONER MOORE:**  ---August of 2007,

20   over nine years, you didn't work?

21   **INMATE COOKS:**  Didn't do anything.  Wasn't

22   allowed to on C-status.

23   **DEPUTY COMMISSIONER MOORE:**  And the reason you

24   were on C-status was?

25   **INMATE COOKS:**  The grooming standards.

1          **DEPUTY COMMISSIONER MOORE:**  And the reason that

2     they decided that you were in violation of the grooming

3     standards was?

4          **INMATE COOKS:**  The length of my hair.

5          **DEPUTY COMMISSIONER MOORE:**  And that was a

6     personal choice of yours?

7          **INMATE COOKS:**  Yes.

8          **DEPUTY COMMISSIONER MOORE:**  And as was mentioned

9     to you in your last hearing by Commissioner, I believe

10    it was Farmer?

11         **INMATE COOKS:**  Yes.

12         **DEPUTY COMMISSIONER MOORE:**  I think he, I read it

13    and there was a statement that he made in there, you

14    have to choose your hill to die on?

15         **INMATE COOKS:**  Yes.

16         **DEPUTY COMMISSIONER MOORE:**  And if this is

17    something you strongly believe in then you stick with it

18    but that there are choices and consequences that go with

19    that choice?

20         **INMATE COOKS:**  Yes.

21         **DEPUTY COMMISSIONER MOORE:**  You remember him

22    saying that?

23         **INMATE COOKS:**  Yes.

24         **DEPUTY COMMISSIONER MOORE:**  Did you agree with

25    him?

1          INMATE COOKS:  No.

2          DEPUTY COMMISSIONER MOORE:  You didn't agree with

3     him.

4          INMATE COOKS:  No.

5          DEPUTY COMMISSIONER MOORE:  Okay.  Why has your

6     status changed from C to your current status?

7          INMATE COOKS:  Because the illegal practice of

8     the grooming standards has changed by law.

9          DEPUTY COMMISSIONER MOORE:  Okay.

10          INMATE COOKS:  In the system, when I come here in

11     the hearing I was told, classification hearing that is,

12     I was told that they don't care about the length of your

13     hair, would you like to come off C-status and work?  Say

14     work or go to school? I would choose school and they

15     said okay.

16          DEPUTY COMMISSIONER MOORE:  Okay.  So for nine

17     years you didn't work and you didn't participate in any

18     programming?

19          INMATE COOKS:  Wasn't allowed.  You can't do

20     anything on C-status.

21          DEPUTY COMMISSIONER MOORE:  So you didn't work

22     and you didn't participate in any programming at all.

23          INMATE COOKS:  None.

24          DEPUTY COMMISSIONER MOORE:  Okay.  Well, let's go

25     back to before that period of time.

1           INMATE COOKS:  Yes, ma'am.

2           DEPUTY COMMISSIONER MOORE:  Let's focus on some

3    things you did do.  Um, you completed the vocation Mill

4    and Cabinet at DVI between June of 93' until June of

5    95'?

6           INMATE COOKS:  Yes, ma'am.

7           DEPUTY COMMISSIONER MOORE:  Did you like that

8    work?

9           INMATE COOKS:  Yes.

10          DEPUTY COMMISSIONER MOORE:  And then I also note

11   soon I think either just at the end of Mill and Cabinet

12   or soon afterwards you became involved in vocational

13   Upholstery.

14          INMATE COOKS:  Yes.

15          DEPUTY COMMISSIONER MOORE:  Did you enjoy that?

16          INMATE COOKS:  Yes, ma'am.

17          DEPUTY COMMISSIONER MOORE:  Sounds like you like

18   working with your hands--

19          INMATE COOKS:  Yes.

20          DEPUTY COMMISSIONER MOORE:  --a lot, or did you

21   get to use any of your creative skills in Mill and

22   Cabinet or Upholstery?

23          INMATE COOKS:  Since I been down?

24          DEPUTY COMMISSIONER MOORE:  No, when you were

25   back there, did you get back in those days.

1    **INMATE COOKS:** Yes. One of the um photo albums I

2    passed shows some of my work in both of those, as well

3    as auto body.

4    **DEPUTY COMMISSIONER MOORE:** Okay, I'm going to

5    take a look at the second one. I was just looking at

6    your drawings of the animated figures in the first one.

7    They all look quite fierce.

8    **INMATE COOKS:** That's what, in the video market

9    has today. All three of those was a video games that

10    you looked through. So it's for the market.

11    **DEPUTY COMMISSIONER MOORE:** Would you say—what

12    age group would you say that video would be marketed to?

13    **INMATE COOKS:** Young adults.

14    **DEPUTY COMMISSIONER MOORE:** Yeah.

15    **INMATE COOKS:** High teens, young adults.

16    **DEPUTY COMMISSIONER MOORE:** How about 14-year-

17    olds?

18    **INMATE COOKS:** No, no.

19    **DEPUTY COMMISSIONER MOORE:** Good answer.

20    **INMATE COOKS:** That would be up to the parents.

21    **DEPUTY COMMISSIONER MOORE:** Yeah, okay. But you

22    would recommend it for young adults.

23    **INMATE COOKS:** God yes.

24    **DEPUTY COMMISSIONER MOORE:** Okay. After

25    vocational Upholstery I note that you participated in

58

1    vocational Auto Body.

2         INMATE COOKS:  Yes, ma'am.

3         DEPUTY COMMISSIONER MOORE:  Did you finish that

4    vocation or were you removed from it early because of

5    the grooming standard issue?

6         INMATE COOKS:  It was finished and then I was

7    removed.

8         DEPUTY COMMISSIONER MOORE:  Okay.

9         INMATE COOKS:  I was waiting to go to Drafting

10   and then I was removed before that.

11        DEPUTY COMMISSIONER MOORE:  Okay.  So there was a

12   lot of programming for you at DVI.

13        INMATE COOKS:  Yes.

14        DEPUTY COMMISSIONER MOORE:  You really got to

15   learn some different skills.

16        INMATE COOKS:  Yes.

17        DEPUTY COMMISSIONER MOORE:  Do you think any of

18   them have become rusty um, as a result of um, the past

19   nine years with no--

20        INMATE COOKS:  Probably the Auto Body because

21   there's a, the chemicals that was be needed to mixture

22   would have to read up or study on those but other than

23   that, no Upholstery is, I did Upholstery on the street

24   with my father because he did it part time.  You know,

25   so I did it with him, building cabinets I did that

1  through junior high and high school.

2      DEPUTY COMMISSIONER MOORE:  Who'd you do that

3  with?

4      INMATE COOKS:  Building cabinets?

5      DEPUTY COMMISSIONER MOORE:  Yeah, when you were

6  in junior high.

7      INMATE COOKS:  Junior high and high school, wood

8  vocation with wood.

9      DEPUTY COMMISSIONER MOORE:  Who were you working

10 with?  Oh, in the high school.

11     INMATE COOKS:  In the high school yes.

12     DEPUTY COMMISSIONER MOORE:  Back when they used

13 to have shop.

14     INMATE COOKS:  Yes.

15     DEPUTY COMMISSIONER MOORE:  They don't have shop

16 anymore in case you didn't know.

17     INMATE COOKS:  Oh, no, I didn't.

18     DEPUTY COMMISSIONER MOORE:  They need to.

19     INMATE COOKS:  Yes.

20     DEPUTY COMMISSIONER MOORE:  Um, there's also a

21 period of time where you worked as a printer.

22     INMATE COOKS:  That was in New Folsom.

23     DEPUTY COMMISSIONER MOORE:  Yup.

24     INMATE COOKS:  Yes.

25     DEPUTY COMMISSIONER MOORE:  Yeah, 89' to 90'.

1    And then there was some carpentry work in 96' to 97' at

2    DVI.

3         INMATE COOKS:  Yes.

4         DEPUTY COMMISSIONER MOORE:  And receiving average

5    work evaluations.  I'm um, I don't have anything to

6    evaluate you on, or we as a panel don't have anything to

7    evaluate you on though since 1998 other than a

8    disciplinary history.  Because there's no laudatory

9    chronos during that period of time either.  Is that a

10   fair statement?

11        INMATE COOKS:  Yes.

12        DEPUTY COMMISSIONER MOORE:  Okay.  Is there

13   anything else you'd like me to cover at this time that I

14   may have overlooked before I move on to the disciplinary

15   history?

16        INMATE COOKS:  All of the RPP recidivism

17   programs?  The self help groups?  All of those was

18   completed at DVI as well.

19        DEPUTY COMMISSIONER MOORE:  Okay, there were a

20   number of self help groups that you were in Straight

21   Life for a while?

22        INMATE COOKS:  Yes.

23        DEPUTY COMMISSIONER MOORE:  Things like that.

24        INMATE COOKS:  Um-hum.

25        DEPUTY COMMISSIONER MOORE:  But um, but anything,

1   so the recent history, we don't have anything but if we

2   go back into the 90's and late 80's we find a lot.

3       INMATE COOKS:  Yes I've heard things there.

4       DEPUTY COMMISSIONER MOORE:  Okay.  I'm going go

5   to the disciplinary history now and note that you have

6   14 115's.  I will note that seven of them are for

7   grooming standards in 98' and 99'.

8       INMATE COOKS:  Yes.

9       DEPUTY COMMISSIONER MOORE:  Okay.  So taking the

10  grooming standard 115's out, you have seven that remain.

11  The most recent was in March of 2005 for being out of

12  bounds.

13      INMATE COOKS:  Yes.

14      DEPUTY COMMISSIONER MOORE:  Does that one sound

15  familiar to you?

16      INMATE COOKS:  Yes.

17      DEPUTY COMMISSIONER MOORE:  Um, what were the

18  circumstances of that?

19      INMATE COOKS:  During prayer, one of the clocks

20  in the unit was set backwards.  I don't know if the

21  batteries stopped in it or not but during prayer the end

22  of prayer day room was closed, called closed but we was

23  in the middle of prayer so it took a couple of minutes

24  later but we still was written up for it.  And it was

25  reduced to a 128 I believe.

1    **DEPUTY COMMISSIONER MOORE:**  I'm looking for notes

2    to that effect and I'm not seeing it being reduced.  Let

3    me just keep looking here.  30 day credit forfeiture.

4    When you reviewed your C-file in April did you note any

5    sort of documentation that reduced it to a 128?

6        **INMATE COOKS:**  Only from the hearing.  I didn't

7    see it in the C-file.

8        **DEPUTY COMMISSIONER MOORE:**  That's something I'd

9    really like you to follow-up on.

10       **INMATE COOKS:**  Yes, ma'am.

11       **DEPUTY COMMISSIONER MOORE:**  Because I'm looking

12   for it and I've been pretty thorough in your C-file in

13   trying to find different things and that's one I'm not

14   finding.  So if you have an opportunity to have to

15   prepare for a Board again when you go through that, it's

16   something that I recommend to you that you verify and

17   get the counselor to address as well.

18       **INMATE COOKS:**  Okay.

19       **DEPUTY COMMISSIONER MOORE:**  Okay?  The um, if I

20   go past the grooming standards and then go back to 96',

21   October of 96' misuse of State property and then in 94'

22   there's stimulants and sedatives.  What was that one

23   about?

24       **INMATE COOKS:**  They said that I had um marijuana

25   TC, that's they put it down, in my system.  But I stated

1   to them that I was on potty watch for almost eighty-

2   some, forty-some hours, forty-eight hours none of my

3   urinating thing was tested at that time.  And after a

4   family visit they said that the urine that I went out

5   wasn't dirty but what came back in was.  I requested

6   that it be tested again.  They said it was threw out, so

7   that did not leave any appeal action of that urine.

8   They say that THC stays in your system at least 14 to 30

9   days.  I requested for another urine analysis and was

10  denied and that's where that stopped at.

11          DEPUTY COMMISSIONER MOORE:  Okay.

12          INMATE COOKS:  Over the past 15 years or almost a

13  decade before that I had stopped using marijuana or

14  anything.

15          DEPUTY COMMISSIONER MOORE:  Including alcohol?

16          INMATE COOKS:  Never was used into alcohol.

17          DEPUTY COMMISSIONER MOORE:  Never drank alcohol?

18          INMATE COOKS:  No.

19          DEPUTY COMMISSIONER MOORE:  Just weed?

20          INMATE COOKS:  Yes, ma'am.

21          DEPUTY COMMISSIONER MOORE:  Okay.  And, so when

22  was the last time.  Do you have a clean date?

23          INMATE COOKS:  What do you mean clean date?

24  Since last time, exact date, no ma'am, it's been over 15

25  years.

1       **DEPUTY COMMISSIONER MOORE:**  Okay.  Um, I would

2  also note that you have 16 128's.  And the last one, and

3  there's a number of them that are also for grooming

4  standards.  I didn't, I think I did go through and count

5  how many there were because I wanted to separate them

6  out.

7       **INMATE COOKS:**  Um-hum.

8       **DEPUTY COMMISSIONER MOORE:**  Um, there were some

9  that were still grooming standards so let me just take a

10  moment and come up with that number if I might.  It

11  looks like there's four of them that fall within that

12  category out of the 16.  The most recent is in July 28th

13  of 2006 soon after arriving here at Solano.  And in

14  reviewing this it said there was a public address order

15  to get down.

16       **INMATE COOKS:**  Yes, ma'am.

17       **DEPUTY COMMISSIONER MOORE:**  And you stood up from

18  the table in the day room, ignored the get down order

19  and continued to walk into the K-dorm.  Does that one

20  sound familiar to you?

21       **INMATE COOKS:**  That's when I was having problems

22  with my back because they had me in a middle bunk.  And

23  because of injuries, old injuries, being stuck up in the

24  bunk I was going back and forth to the infirmary in

25  order to try to get out of the middle bunk and wear my

1 back brace.  And to stay down on the ground for a long

2 time in the position of sitting down causes pains in my

3 back, so I backed up into K-dorm and several other

4 individuals but I was the only one that was written up.

5 And I talked to the officer Dan and he just told me, try

6 not to let it happen again and he leave it at that.  So

7 I left it at that myself.

8        **DEPUTY COMMISSIONER MOORE:**  Okay.  The one

9 previous to that is September of 03', and that one is

10 um, covering your cell window?

11        **INMATE COOKS:**  Yes.  That one is, there's two

12 peoples in the cell at that time.

13        **DEPUTY COMMISSIONER MOORE:**  Um-hum.

14        **INMATE COOKS:**  I didn't have it covered; it was

15 covered up by my bunkies area up top.  I don't go in his

16 stuff, don't move his stuff, but they write both

17 individuals up in the cell.  And that was the reason why

18 it was dropped to a 128 because he admitted to that he

19 put it up there.

20        **DEPUTY COMMISSIONER MOORE:**  There's a couple

21 different instances, and I am going back in history a

22 little bit but I just wanted to ask you about what is

23 your perceived response to certain, the officer's

24 perceived response to certain things.  Um, and I am

25 going back in history.  Back to when you were

1   programming before the grooming standards issue.  Back

2   in 96' you were assigned to empty out the trash from an

3   office and, at DVI, and you responded, "I'm not your

4   office bitch."  Um, and you responded positively to the

5   counseling but does that sound like what happened?

6         **INMATE COOKS:**  Yes.

7         **DEPUTY COMMISSIONER MOORE:**  Um, I'm going to give

8   another example of something else that happened.  You

9   were, you failed to report to the classroom at DVI.

10   This is why you were programming well I might add.  And

11   you were ordered to respond to classroom and um, you

12   just said, "I have to go, I'll see you at the hearing."

13   You were just going to accept the write-up um, about the

14   restroom use and not returning to the classroom.  Does

15   that one sound familiar to you?

16         **INMATE COOKS:**  Yes.

17         **DEPUTY COMMISSIONER MOORE:**  Anything you wanted

18   to add to that?

19         **INMATE COOKS:**  Okay, as far as the um, the first

20   one, you asked about, about being the office bitch.  The

21   officers at that time, it was in a laundry room and they

22   have a saying amongst the officers whose going to be the

23   office bitch today, clean up the office, their trash,

24   they may sit there and spit seeds on the floor when the

25   garbage cans is there and I told them um, because my job

1  requirement was laundry and not your office, and he got

2  upset about it.  Yeah, I say if you want to send me out

3  and go back to the cell I'll go.  If you want me to stay

4  here and work I'll work but I'm not going to clean your

5  office.  And as far as the bathroom, in the morning the

6  bathroom is closed.  Rather than um, urinate on myself I

7  went in the bathroom and I told the officer I need to

8  use the restroom.  She said well if you don't have a

9  doctor's um, requiring you to use the bathroom at any

10  time it's closed right now because peoples were going in

11  the bathroom and smoking.  I don't smoke.

12      **DEPUTY COMMISSIONER MOORE:**  And abusing the

13  privileges?

14      **INMATE COOKS:**  Yes.  And they hold everyone else

15  accountable for someone else's wrongs.

16      **DEPUTY COMMISSIONER MOORE:**  Okay.  Um, there's no

17  other information available in recent history.  At this

18  point I was going to move to the psychological

19  evaluation that was conducted.  And after I do that I'm

20  going to take some time to take a look at your--

21      **INMATE COOKS:**  Yes, ma'am.

22      **DEPUTY COMMISSIONER MOORE:**--the second folder as

23  well that you presented today.  Counselor is there

24  anything else before I move to the 2005 psychosocial

25  assessment?

1        **ATTORNEY CHRISTENSEN:**  No, that's it.

2        **DEPUTY COMMISSIONER MOORE:**  Okay.  Let me just,

3   this psychosocial assessment was prepared by Dr.

4   Starrett, S-T-A-R-R-E-T-T, dated 06/23 of 05'.  Um, the

5   doctor notes that your TABE score, you're familiar with

6   what the TABE test is?

7        **INMATE COOKS:**  Yes, ma'am.

8        **DEPUTY COMMISSIONER MOORE:**  Was a 3.2 um, and I

9   found the range of 3.2 up to 6 point something.  So I'm

10  glad you're going back to school get that (indiscernible

11  1:00:03).  The doctor reviews family history, employment

12  and moving on to substance abuse history, you indicated

13  that you had never tried or used alcohol and that you

14  were 13 when you began to use marijuana.  You have an

15  arrest for this but neither drugs or alcohol were

16  involved in this, in this particular, in the life crime.

17  And that you had never been involved in treatment.  Um,

18  you indicated medically that you had outgrown asthma.

19  No other physical problems.  Under clinical assessment

20  the doctor notes under impressions, under axis-1, adult

21  antisocial behavior and marijuana abuse, nothing under

22  axis-2.  You previously had ulcers?

23       **INMATE COOKS:**  Yes.

24       **DEPUTY COMMISSIONER MOORE:**  Stomach problems?

25       **INMATE COOKS:**  Yes.

1    **DEPUTY COMMISSIONER MOORE:** And strokes?

2    **INMATE COOKS:** Yes, ma'am.

3    **DEPUTY COMMISSIONER MOORE:** You had a stroke?

4    **INMATE COOKS:** Three.

5    **DEPUTY COMMISSIONER MOORE:** When were they?

6    **INMATE COOKS:** I had one in 95', one in 97' and

7    the last one was just when I was mentioning earlier when

8    my body collapsed and it happened at the same time.

9    That was just 2004.

10   **DEPUTY COMMISSIONER MOORE:** And that was, they

11   decided that that was a stroke?

12   **INMATE COOKS:** Yes, it took, it was part of it,

13   because there weren't no iron in my blood, my vitamins

14   was low and I was out asleep for almost 72 hours.

15   **DEPUTY COMMISSIONER MOORE:** Do you still have

16   numbness in your fingers?

17   **INMATE COOKS:** Yes, ma'am.

18   **DEPUTY COMMISSIONER MOORE:** And what do they

19   attribute that to?

20   **INMATE COOKS:** Carpal tunnel.

21   **DEPUTY COMMISSIONER MOORE:** Okay, not to a

22   vitamin B deficiency?

23   **INMATE COOKS:** No.

24   **DEPUTY COMMISSIONER MOORE:** You have a very high

25   GAF score, which is the Global Assessment of

1  Functioning, at 85.  The doctor notes that you were not

2  currently active in any of the um, substance abuse or

3  mental health groups.  There was a review of the life

4  crime.  You discussed it with the doctor noting your

5  acknowledgment of receiving stolen property but denying

6  committing the murder.  Um, the doctor reviewed your

7  juvenile history with you.  And then on page six

8  reviewing the assessment of dangerousness, the doctor

9  looked at your history of violence and use of substances

10 and found that you would be at the low end of the

11 moderate range, in terms of likelihood to commit future

12 violent acts, um, using a historical perspective just on

13 your history, behaviors, juvenile history.  The doctor

14 notes that you have upgraded yourself vocationally and

15 educationally, which is your strong point and has done

16 some self help but needs to do a lot more.  So I think

17 that one could be taken as a recommendation from the

18 doctor.

19      **INMATE COOKS**:  I don't have--excuse me.  They

20 don't have any other.  I've completed all of them.  When

21 I got here in classification I was asked to go into one

22 and I was put on the waiting list and still have been

23 waiting because at DVI if you go through one and then

24 someone else is trying to get in that same one that

25 never been in, you get moved behind.

1    **DEPUTY COMMISSIONER MOORE:**  Well, what waiting

2  lists are you on here?

3    **INMATE COOKS:**  AA and NA I requested for because

4  there wasn't anything else.

5    **DEPUTY COMMISSIONER MOORE:**  What about Stress

6  Management, Relationship Awareness, Anger Management--

7    **INMATE COOKS:**  Completed all those.

8    **DEPUTY COMMISSIONER MOORE:**  --Breaking barriers?

9  Well you completed them about ten years ago.

10    **INMATE COOKS:**  Yes.

11    **DEPUTY COMMISSIONER MOORE:**  Would you say you're

12  a different man today?

13    **INMATE COOKS:**  Yes, ma'am.

14    **DEPUTY COMMISSIONER MOORE:**  Do you think they

15  might have a different impact on you because you got

16  some ten years of wisdom and experience under your belt?

17    **INMATE COOKS:**  I would give more than receive.

18    **DEPUTY COMMISSIONER MOORE:**  And possibly receive

19  some new things.  It could happen.  They say you can

20  teach an old dog new tricks.

21    **INMATE COOKS:**  Yes.

22    **DEPUTY COMMISSIONER MOORE:**  I got a 12-year-old

23  dog that just learned how to sit.  I'm not comparing you

24  to my dog, but he learned a new trick.

25    **INMATE COOKS:**  Yeah but I'm still a young man.

1      DEPUTY COMMISSIONER MOORE:   You're still a young

2    fellow.   You're 44, you are a young fellow.   But I think

3    the suggestion from the doctor here is, and I hope

4    you're open to it--

5      INMATE COOKS:   Yes.

6      DEPUTY COMMISSIONER MOORE:--that it's not like

7    repeating the grade, it's like going back and seeing if

8    there was something that you missed the first time.

9      INMATE COOKS:   Yes.

10      DEPUTY COMMISSIONER MOORE:   Something that might

11   move you to consider something new.   I think that's the

12   recommendation from the doctor in this report.

13      INMATE COOKS:   Um-hum.

14      DEPUTY COMMISSIONER MOORE:   Okay?

15      INMATE COOKS:   Yes.

16      DEPUTY COMMISSIONER MOORE:   The doctor notes that

17   there's a concern about the relapse of use of marijuana

18   but that you have been clean for many years, although

19   not seeking treatment for it in the past nine years.

20   Mental health issues, you do not appear to have any

21   complicating mental health problems.   Um, the doctor

22   talks about comparing your declaration of innocence

23   versus the jury's finding of guilt and that that

24   continues to be a challenge um, for you in this

25   situation.   In rating you in the clinical insight

53

```
 1  factor, you were rated at the low end of the moderate
 2  range for your propensity for future violence.  And then
 3  moving on to what the doctor calls environmental risks,
 4  or risk management, that your parole plans seem well
 5  developed from the doctor's perspective.  Um, there is
 6  some information that needed to be verified.  And that
 7  you would rate in the low range to the low end of
 8  moderate, so low-moderate in terms of risk management
 9  for the future.  Um, and he took into consideration that
10  you've been discipline free since 99'.  I think that has
11  changed a little bit since 05', not participating in
12  alcohol and drug treatment and that you needed to be
13  more active in self help.  Overall you appear to be at
14  the low end of moderate on all factors regarding the
15  propensity to commit violence in the future.  And that
16  would be reduced if you were to remain constantly active
17  in AA or NA, which you say you're on the waiting list
18  for, and more active in self help and remaining
19  disciplinary free.  And it sounds like the path, the
20  door to those things just opened up for you, um, for a
21  lot of different reasons, some of them out of your
22  control, some of them may be in your control but that
23  you're on waiting lists and that the door is opened and
24  now you are going to become the programming fool.
25  You're just going be on every waiting list available.
```

1        INMATE COOKS:  Yes.

2        DEPUTY COMMISSIONER MOORE:  And I say that almost

3    with a sense of humor but also you have a very serious

4    face now but you can see what you did in the 90's was

5    very impressive and early 90's and for the past ten

6    years we don't have anything to evaluate you on.  So you

7    can see the concern.

8        INMATE COOKS:  Yes, that's been my sense of

9    direction ever since.

10       DEPUTY COMMISSIONER MOORE:  That's the conclusion

11   of the psychological evaluation.

12             P A R O L E   P L A N S

13       PRESIDING COMMISSIONER BRYSON:  That sounds good.

14   What about your parole plans, sir?  Uh, do you plan to

15   um; it says reside with your son--

16       INMATE COOKS:  Yes.

17       PRESIDING COMMISSIONER BRYSON:--in Oakland

18   California?  Um, and I don't have any letters of support

19   at all.  Are there any letters of support that you have?

20       ATTORNEY CHRISTENSEN:  Mr. Cooks tells me that

21   some did come in, that he gave them to his counselor and

22   he was not able to maintain a copy for himself and um,

23   unfortunately they never made their way into the C-file

24   so we have no evidence of that.

25       PRESIDING COMMISSIONER BRYSON:  Okay, um and

1   let's just represent what it is today sir so that we do

2   have this on record.  Is your son offering housing

3   support for you?

4          INMATE COOKS:  Yes.  Um, excuse me if I may.

5          PRESIDING COMMISSIONER BRYSON:  Um-hum.

6          INMATE COOKS:  I have offers from several

7   individuals that's what some of the letters spoke of.  I

8   placed the letters in my counselor Mixer's (spelled

9   phonetically) hand personally and he did not, he told

10  me, he couldn't get up and get copies then but they will

11  be on record at the Board hearing.

12         ATTORNEY CHRISTENSEN:  How long ago was this when

13  you had this conversation with him?

14         INMATE COOKS:  Oh, about two months ago, a month

15  or so or something like that.  And one of the letters

16  was from a Mr. Keith Dodds (spelled phonetically), a

17  police officer in Alameda County and another one is Mr.

18  Brian McGee (spelled phonetically) resides in Oakland,

19  Alameda County.  He's been working with ex-cons and for

20  housing and jobs.  I'm not sure of his full title but

21  it's as a social worker.  Some being my brother, my

22  sister-in-law that owns a salon and some of her friends

23  are willing to allow me to place art work into their

24  establishment to be sold.  Um, requests.  Not my

25  request, their request to sell different stuff.  My

1    business plan states everything for the company itself.

2    But I would be selling and I have over 100 different

3    products ready for the market.  People are just waiting

4    on me to get them because I can't run a business from

5    being incarcerated as far as legal status.

6        PRESIDING COMMISSIONER BRYSON:  Um-hum.  Products

7    such as what sir?

8        INMATE COOKS:  Um, clothing, posters, greeting

9    cards, post cards, um, sheets, you know, prints on

10   sheets, pillow cases, book coverings for kids, different

11   stuff.

12       PRESIDING COMMISSIONER BRYSON:  Um-hum.

13       INMATE COOKS:  If you need more I can go into the

14   business plan speaks on names several of them, it's all

15   written out if need be I can go into it verbally.

16       PRESIDING COMMISSIONER BRYSON:  Um-hum.  Um, we

17   have, I've been reading some of that material.  Okay,

18   it's really unfortunate that none of that has made it

19   here.  It says that you plan to seek employment in the

20   area of upholstery or milling cabinets, which you

21   completed training while incarcerated uh, or work in a

22   warehouse until you can get your own business on its

23   feet.

24       INMATE COOKS:  Yes, ma'am.

25       PRESIDING COMMISSIONER BRYSON:  If that's

1  correct.

2          INMATE COOKS:  Yes ma'am.

3          PRESIDING COMMISSIONER BRYSON:  Well that at

4  least appears realistic that you do plan to pursue a day

5  job until you can get the job created that you want.

6          INMATE COOKS:  That's right.

7          PRESIDING COMMISSIONER BRYSON:  Um, creating a

8  business is hard work and it appears that you understand

9  that and not all businesses are successful of course.

10  Um, so we will be looking in depth at your business plan

11  there to see more about it.  Um, and have you, I think

12  you covered this but I'm not sure, have you taken any

13  business courses per se?

14          INMATE COOKS:  In sales studies.  I just, I get

15  books sent in from different peoples on the street and

16  from colleges I'll get books like that.  My brother sent

17  me some in sales studies because I was on C-status and I

18  couldn't take any college courses through the colleges

19  or anything like that.  So I get all the material and

20  study with someone that is taking the course.  And

21  that's what helped me to put together my business plan

22  and study.  And I've been doing that for over a decade.

23          PRESIDING COMMISSIONER BRYSON:  Well what I saw

24  is a business plan.  It's not really a complete

25  comprehensive business plan.  Now, I don't know if you

1  have more materials elsewhere back in your house or

2  whatever but there are some things here you obviously at

3  some point you would have to address a budget.  You talk

4  about marketing and that's important but you have to

5  firm up these plans.  Obviously this is just the

6  beginning of what you would be doing.

7       INMATE COOKS:  Yes.

8       PRESIDING COMMISSIONER BRYSON:  Is that correct?

9  Okay.  Oh, and I didn't realized all the multiple pages,

10  so then I haven't seen your business plan.  I just

11  looked at a few pages.  I didn't realize that there's

12  quite a bit there.

13       DEPUTY COMMISSIONER MOORE:  There's more here

14  descriptive in nature but the numbers haven't been put

15  in.  You haven't come up with projections and need,

16  capital output, outlay and things like that.  That's

17  something that will continue in your plan.

18       INMATE COOKS:  Yes.  I have, it's just not there.

19       PRESIDING COMMISSIONER BRYSON:  I see.  Okay.

20  All right.  Is there any---

21       INMATE COOKS:  Because the last time I mentioned

22  it at one of the Boards I was told in a fashion that, to

23  me I took it as a slap in the fact, like, some pretty

24  big numbers you mentioned because with four pictures I

25  can put together over a quarter of a million dollars off

59

1  of two thousand sales of copies of those pictures at 85

2  to 35, uh 135 dollars apiece.  And that was like 170,000

3  dollars at 85 dollars apiece.  But at 135 dollars

4  apiece, adding glass and a frame, that's 270,000

5  dollars.  Taxes off that, sales taxes, break down to 20

6  to 30,000 dollars to the government.  I'm still clearing

7  right above or right under a quarter of a million

8  dollars.

9       PRESIDING COMMISSIONER BRYSON:  Of course that's

10 a pretty ambitious sales target.  That's you know,

11 that's the question, would the sales be there and

12 that's--

13      INMATE COOKS:  Yes, I've done the marketing and

14 checked and everything.

15      PRESIDING COMMISSIONER BRYSON:  Um-hum, well

16 that's good. Um, and have you thought of linking this in

17 with video games per se on computer?

18      INMATE COOKS:  Yes, the video, the three video

19 games are separate from what I just mentioned.  The

20 video games themselves is up for sale or if it came down

21 to me having to market them it would cost me a little

22 more to market them because I'm not out there yet. But

23 if someone else would buy the game from me, all right.

24 The only thing I would keep is the apparel part of the

25 business.  Meaning that I would like to sell posters of

50

1    the fighters or what have you of the game and stuff like

2    that.  They keep the animated division and stuff like

3    that.  So I have studied and done all those.

4        PRESIDING COMMISSIONER BRYSON:  Wow.  Okay.

5        DEPUTY COMMISSIONER MOORE:  Did you make this

6    roll-top desk?

7        INMATE COOKS:  Yes, ma'am.

8        PRESIDING COMMISSIONER BRYSON:  Isn't that

9    beautiful?

10        DEPUTY COMMISSIONER MOORE:  Nice work.

11        PRESIDING COMMISSIONER BRYSON:  Um-hum.

12        DEPUTY COMMISSIONER MOORE:  Nice work, good body

13    fender work too.

14        INMATE COOKS:  Thank you.

15        PRESIDING COMMISSIONER BRYSON:  All right.  We

16    sent out 30-42 notices.  Those notices go to agencies

17    having a direct interest in your case and we have the

18    District Attorney from Alameda County who is here to

19    make a statement regarding parole suitability prior to

20    conclusion of this hearing.  Questions.  We're going to

21    get to that.  I haven't gotten to that yet.

22        ATTORNEY CHRISTENSEN:  I thought you had said she

23    was going.  I misheard you.

24        PRESIDING COMMISSIONER BRYSON:  No, this is the

25    order in which we conduct the hearing.

1   **ATTORNEY CHRISTENSEN:**  I misheard you.

2   **PRESIDING COMMISSIONER BRYSON:**  All right.

3   Commissioner, do you have any questions that need to be

4   addressed at this time?

5   **DEPUTY COMMISSIONER MOORE:**  No.

6   **PRESIDING COMMISSIONER BRYSON:**  All right then

7   the District Attorney has questions.

8   **DISTRICT ATTORNEY KLINGE:**  Thank you.  I have a

9   couple.  Um, I just wanted to ask for the record.  In

10  1983 when the inmate had an arrest and conviction for

11  possession for marijuana for sale he was also arrested

12  for possession of a fire arm.  Um, is that correct?

13  **PRESIDING COMMISSIONER BRYSON:**  Were you arrested

14  for possession of a fire arm at that time sir?

15  **INMATE COOKS:**  No, ma'am.  I believe what she's

16  speaking of is when I was arrested at that time, there

17  was a gun taken out of the house, out of my room and the

18  gun was proven it did not work.  And that was brought

19  into the courtroom at that time.

20  **DISTRICT ATTORNEY KLINGE:**  Since the inmate was

21  unable to formally program due to his C-status for a

22  long period of time, did he do any NA or AA self study

23  in his cell?

24  **INMATE COOKS:**  Yes, ma'am.

25  **DISTRICT ATTORNEY KLINGE:**  And can the inmate

1    describe how he did that.

2         INMATE COOKS:  To continue at that time, I was

3    allowed to keep one of the two books, a guideline of AA

4    and I read through that from time to time during the

5    time of working on my business plans and stuff like

6    that.

7         DISTRICT ATTORNEY KLINGE:  And has the inmate

8    worked all the steps?

9         INMATE COOKS:  I went through them, yes.

10        DISTRICT ATTORNEY KLINGE:  And did the inmate

11   formally work step four?

12        INMATE COOKS:  In what capacity if I may ask?

13        DISTRICT ATTORNEY KLINGE:  Well maybe the inmate

14   could describe how he worked step four.

15        INMATE COOKS:  Okay, all the steps were just

16   studying in the hearings when I was allowed to go the

17   meetings.  Different individuals partake in reading

18   through some of the steps and discuss the steps with

19   individuals coming from the street involved in AA.  By

20   um, the requests of the courts I believe.

21        DISTRICT ATTORNEY KLINGE:  Does the inmate know

22   what step four is?

23        INMATE COOKS:  Not straight off, no ma'am.

24        DISTRICT ATTORNEY KLINGE:  Thank you. Um, does

25   the inmate have any tattoos?

1    **INMATE COOKS:** Yes.

2    **DISTRICT ATTORNEY KLINGE:** Could he describe them

3    for us? And I'm not being rude; I have to talk to the

4    panel.

5    **INMATE COOKS:** I understand that. Um, to be more

6    precise, in one of the back of one of my art books,

7    there are two that's on my back and one on my arm. Not

8    that one, I believe in this one you have. Nah.

9    **PRESIDING COMMISSIONER BRYSON:** You've indicated

10   to the District Attorney.

11   **INMATE COOKS:** The G, not that one, that one

12   there. Yes ma'am. That one, then the next page there's

13   another one that says Ghost. That one and then the one

14   next to it, yes, the Siberian tiger and that's on my

15   arm. Those are the three on my arm, those are the three

16   and then I have bands with my art name on one and my

17   companies name on the other. And then I have a little

18   ghost on my right arm. And across my chest I have a

19   cross with my mother's nickname on my left side; I have

20   always loved my mother written out.

21   **DISTRICT ATTORNEY KLINGE:** Um, was the inmate um,

22   ever part of the Ghost Town Mob or Ghost Town Boys?

23   **INMATE COOKS:** No, I was accused of that.

24   **DISTRICT ATTORNEY KLINGE:** Did the inmate live in

25   Ghost Town?

1        INMATE COOKS:  No.

2        DISTRICT ATTORNEY KLINGE:  Um, I was looking

3   through the inmate's art work, which is quite

4   impressive, and very expensive.  First question, um, did

5   the inmate ever produce some of this art at the request

6   of their inmates or for marketing for them?

7        INMATE COOKS:  Only one picture, two pictures in

8   that collection that was done for other individuals.

9        DISTRICT ATTORNEY KLINGE:  And am I correct in

10  assuming that some of the artwork of more sexual nature

11  is not for the video game.

12        INMATE COOKS:  No, ma'am.

13        DISTRICT ATTORNEY KLINGE:  Okay.  Then I did note

14  one photograph of your artwork that is about a Kumi

15  warrior?

16        INMATE COOKS:  Yes.

17        DISTRICT ATTORNEY KLINGE:  Could the inmate

18  explain that?

19        INMATE COOKS:  That was requested for their tats.

20  It ended up being I didn't know it was going to be for

21  their tat.  I would just describe a picture and asked me

22  and that whole pictures not, they just took the warrior

23  and the continent of Africa, they used it instead of the

24  whole picture.

25        DISTRICT ATTORNEY KLINGE:  And that would be for

1  the Kumi 415 group?

2      **INMATE COOKS:** Yes, that's I believe that's what

3  they used.

4      **DISTRICT ATTORNEY KLINGE:** And then I found

5  another one with an individual coming out of it, oh,

6  what do they call the wind up boxes.

7      **INMATE COOKS:** Jack-O-Lantern box.

8      **DISTRICT ATTORNEY KLINGE:** Um, with an assault

9  weapon and it says "jokes on you" with a light pole

10  labeled "Oaktown" and I can't see what the word is

11  underneath it.

12      **INMATE COOKS:** It was um, supposed to have been

13  for a guys album cover. That, what you can't see on the

14  bottom is Nitchy (spelled phonetically), is his name.

15  This was supposed to have been for an album cover.

16      **DISTRICT ATTORNEY KLINGE:** In what year

17  approximately if the inmate can recall, did the 415

18  commission him to do the artwork.

19      **INMATE COOKS:** I believe I done that one in 92',

20  between 92' and 93'.

21      **DISTRICT ATTORNEY KLINGE:** Thank you.

22      **INMATE COOKS:** Because there was a re-done.

23  Someone else had done it and they didn't like how it

24  came out and I was asked to do that one and I done that

25  one and that's what they accepted.

1    DISTRIC ATTORNEY KLINGE:  Thank you.  I have no

2    further questions.

3        PRESIDING COMMISSIONER BRYSON:  All right.

4    Counselor I'd like to know if you'd like to ask any

5    questions.

6        DISTRICT ATTORNEY KLINGE:  Oh wait, I did have

7    one more, I'm sorry.

8        ATTORNEY CHRISTENSEN:  Go ahead.

9        DISTRICT ATTORNEY KLINGE: I'm sorry.  I was

10   looking through the book and I believe the front page of

11   this one, Agbulom Enterprises is your business as the

12   inmate stated, correct?

13       INMATE COOKS:  Yes, ma'am.

14       DISTRICT ATTORNEY KLINGE:  Just because there was

15   a piece of paper floating in front, I was curious, I was

16   reading it.  It says, however as long as it takes I will

17   hunt them down and make them pay.  What---

18       INMATE COOKS:  That's part of the comic book.

19       DISTRICT ATTORNEY KLINGE:  Part of the comic

20   book.

21       INMATE COOKS:  Yes, its some pictures that's in

22   the loose envelope shows part of the comic book except

23   for a few pictures.  Where a young lady is standing up

24   on a cliff with a sword and four other fighters with

25   her.  That's.

1      **DISTRICT ATTORNEY KLINGE:**  Thank you for that

2  clarification.  I'm done now.

3      **PRESIDING COMMISSIONER BRYSON:**  All right, go

4  ahead counsel.

5      **ATTORNEY CHRISTENSEN:**  Okay, all right.  Were you

6  artistic prior to coming to prison?

7      **INMATE COOKS:**  Yes, ma'am.

8      **ATTORNEY CHRISTENSEN:**  But would you say you

9  developed your talents more fully after being here?

10      **INMATE COOKS:**  No, I would say I combined my time

11  more towards it because I was at the Boys Club, Nelson

12  Boys Club in Oakland, Alameda County and then East

13  Oakland as well and did it from time to time but running

14  back and forth to the street what deterred me at times.

15      **ATTORNEY CHRISTENSEN:**  So you had more time, you

16  had more time in here to do that.

17      **INMATE COOKS:**  Yes, ma'am.

18      **ATTORNEY CHRISTENSEN:**  Now at the Boys Club that

19  you mentioned, is that the same Boys Club that you would

20  like to go back to and help them kids?

21      **INMATE COOKS:**  Yes, ma'am.  That one and

22  different centers.

23      **ATTORNEY CHRISTENSEN:**  Is that because you have

24  happy memories of pleasant experiences there?

25      **INMATE COOKS:**  Some of the memories have a lot to

1  do with it and my own thoughts of just kids being in the

2  street at this day and time, 2007. I still see and hear

3  about kids on the street for instance, if I may mention,

4  just the other night I heard two 15-year-olds somewhere

5  I believe Sacramento or Stockton or something robbed a

6  ice cream man and shot him for what? No reason. You

7  robbed him, why shoot him? Why even rob him when

8  there's so much other things you can do? But they'd

9  been deterred because no one is speaking in a fashion

10  that someone I believe in my position should show them

11  the path that I went down and got caught up for

12  something that I didn't do. It's easy once you, it's

13  put into the light to be say well, he had done this.

14  Maybe he did do this and I believe that's what a lot of

15  kids are getting into now out of fear from other

16  individuals, not so much as peer pressure, I think that

17  peer pressure is a word that was coped out to use by

18  adults. Kids use it because it's okay, it's accepted by

19  adults. Well I was pressured by them and their mother

20  and father and teachers or what not in school throw that

21  in their face and that's an out for them. When I don't

22  believe peer pressure plays a role. You have a choice.

23  You either do or you don't, accept the consequences

24  either way. And when you did, if you don't there's kids

25  your age that's trying to get you to do it it's going to

1   be against you and then who knows, your father, your

2   mother, your brothers or somebody may um say "aw, you

3   could've went with them, you was scared of this and

4   that". If that's what you call peer pressure I accept

5   it as that but the definition pushed by adults when I

6   was younger, I don't see that as peer pressure because I

7   never accepted peer pressure myself. Not because I was

8   good with my hands or my feet or wrestling or anything

9   but just that if I didn't want to do something, I didn't

10  do it. That was accepted because of my mother, that's

11  how she taught me. If you don't want to do it, don't do

12  it. If you get beat up because you don't want to go,

13  accept that.

14       **ATTORNEY CHRISTENSEN:** Thank you Mr. Cooks, no

15  more questions for him.

16       **PRESIDING COMMISSIONER BRYSON:** Well sir, then I

17  have a question toward the end of that. If you don't

18  want to do it, don't do it but then the question

19  becomes, if you don't—if you do want to do it then I

20  suppose the opposite of that's true to do it.

21       **INMATE COOKS:** Exactly.

22       **PRESIDING COMMISSIONER BRYSON:** Right, okay. So

23  why would you do art work for the 415?

24       **INMATE COOKS:** At that time I was given food. I

25  sold the pictures to them. I didn't just do it for

1   them.   They requested that.   Someone come up and ask me

2   to do a card.   Now, because now I'm on to something

3   bigger as far as all my time I put into my drawing now

4   is towards my company, so I won't do a card, but someone

5   commissioned me to do a portrait of their parents or

6   something or they wife with them, I would do it and I

7   would charge them like and that's how I pretty much get

8   most of my canteen.

9        PRESIDING COMMISSIONER BRYSON:   Suppose I came to

10  you and I was a member of a gang and I said you know,

11  I've got this symbol and I like your artwork and I'll

12  pay you 500,000 dollars to do.

13       INMATE COOKS:   500,000 dollars is a number that

14  you, I believe threw out there to see if I would do it.

15       PRESIDING COMMISSIONER BRYSON:   I don't know,

16  whatever, you get the point.

17       INMATE COOKS:   I understand and yes and that's

18  what I was going to say, I wouldn't do it because the

19  500,000 dollars can be gone in a matter of moments even

20  if I received it, but that's not the lifestyle I want to

21  be connected to.   So I refuse to do it.   And fear from

22  being hurt by someone?   I don't fear that.

23       PRESIDING COMMISSIONER BRYSON:   But that's not

24  the issue I'm talking about, you understand that?

25       INMATE COOKS:   Yes.   Yes, ma'am.

1          C L O S I N G   S T A T E M E N T S

2          **PRESIDING COMMISSIONER BRYSON:**  Okay.  Okay.  And

3    I'd like to invite the District Attorney to make closing

4    statements.

5          **DISTRICT ATTORNEY KLINGE:**  Thank you.  Um, the

6    Alameda County District Attorney's Office is opposed to

7    parole at this time and I believe the inmate's

8    unsuitable and could pose a danger to the community.

9    Um, it's based on numerous factors and obviously one big

10   factor is the length of time without any formal

11   programming um, the inmate incurred recently then I'll

12   speak to that in a minute. Um, the commitment offense,

13   which the inmate has a right not to speak to and I

14   realize that on title 15 he does not have to admit guilt

15   to be eligible for a parole date.  But the commitment

16   offense is still there.  And the inmate was convicted by

17   a jury of first degree murder and attempted robbery.

18   And the evidence in the trial came from one witness at

19   the scene who identified the inmate as being present at

20   the scene and being the individual that was more in

21   charge of the victim than the others. And from at least

22   one to two other people that overheard the inmate then

23   bragging about the details of the crime.  And I've

24   reviewed the transcripts of those taped statements.  The

25   commitment offense was certainly carried out in a cruel

72

```
 1  and callous, heinous and atrocious manner.  I've also
 2  viewed the pictures of the crime scene.  The 64-year-old
 3  victim was a known marijuana dealer in the neighborhood
 4  but by all accounts from everybody he um, dealt fairly
 5  as a drug dealer and um was well liked.  On the evening
 6  of the offense, a group of young men gained entry into
 7  his home and killed him in an extremely cruel and
 8  callous manner.  I mean it was a calculated crime it was
 9  planned robbery.  This man was beaten severely, choked
10  to death with a sweater that was tied around his neck
11  and tightly twisted.  His feet were bound with a
12  telephone cord, he was bloody and he was stuffed in
13  between the mattresses in his bedroom.  And then while
14  he was laying there the men emptied the house and took
15  the last from the house, including the tape player that
16  was recovered from the inmates house, a safe and
17  marijuana and other items.  Um, he was left, he was
18  either dead when they left or left to die in that
19  horrible manner.  And he was certainly abused during
20  this attack.  The motive for the crime, monetary gain is
21  trivial though any motive for murder is trivial I think
22  one could posture.  The inmate denies the crime, which
23  always does put the panel and the psychiatrist and
24  everyone in a difficult position.  Um, and on top of
25  that he's not speaking to the crime today, as is his
```

73

```
 1  choice. But that crime alone certainly was egregious
 2  heinous enough to alone deny parole on but there are
 3  other factors that the panel can look to.  The inmate
 4  does have a criminal history, though not extensive um
 5  before his arrest, he was arrested though at a very
 6  young age.  Um, there was a charge of the gun possession
 7  and he states it was a gun that was in his bedroom.  And
 8  there was the conviction for the possession for sale of
 9  marijuana.  Um, he um, programmed well at DVI and then
10  went into C-status based on his religious beliefs, which
11  was his choice.  Um, and then did not do any formal
12  programming.  He may have very well have done a lot of
13  self help and self study but unfortunately we don't have
14  anything here such as book reports or anything concrete
15  that the panel can look to.  Um, the doctor,
16  psychiatrist and other panels have strongly suggested
17  substance abuse counseling such as NA or AA and the
18  inmate, while he states he's tried to keep up with it,
19  doesn't know his steps and should know them and work
20  through them completely to not only help deal with the
21  marijuana issue that he had before becoming into custody
22  he did have a substance abuse 115, which he claims he's
23  not guilty of but is indicative of some use while in
24  custody.  Also from when he is allowed to go to the
25  group NA and AA he'll get a group activity and he'll be
```

1  able to interact with others and gain other benefits

2  from that.  Um, so there isn't really any work history

3  or recent programming that the panel can look to.  He

4  has unfortunately received some recent discipline.  Life

5  inmates should be disciplinary free for at least a

6  substantial period of time to show that they can conform

7  to the rules of the institution and in order for the

8  panel to feel comfortable that they can conform to the

9  rules of society.  Um, the psychiatric report from 05'

10  did speak well to the inmate but also rated him in the

11  low end of the moderate range and I've seen much lower

12  ratings.  And perhaps, if the inmate is not granted a

13  date and does get a new psychological examination he

14  will have done some programming before that examination

15  and that rating may change.  Um, his parole plans sound

16  like he certainly spent a lot time on his business.  Um,

17  it's unfortunate that the letters of support didn't

18  reach the file.  Um, so if there is not a grant,

19  hopefully they will reach the file before the next date

20  and he'll bring in copies himself just in case they

21  don't.  And with that I'll submit it.

22      **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

23  now counselor.

24      **DISTRICT ATTORNEY KLINGE:**  Oh I'm, sorry one more

25  thing.

1      **PRESIDING COMMISSIONER BRYSON:**  Go ahead.

2      **DISTRICT ATTORNEY KLINGE:**  I'm on my last hearing

3  of the day, I keep forgetting things.  I would just

4  mention that he was, as the Panel knows, identified as a

5  member of the 415 disruptive group, as they call it in

6  the prison system and his answer to his involvement in

7  it when the panel questioned him, I found was somewhat

8  evasive and inconclusive.  And um, with that I'll

9  submit.

10     **PRESIDING COMMISSIONER BRYSON:**  All right.

11  Counsel I'd like to invite you to make a closing

12  statement.

13     **ATTORNEY CHRISTENSEN:**  Mr. Cooks is obviously a

14  very talented and gifted inmate.  It's not the usual

15  thing where an inmate comes with a portfolio of his work

16  and um, the um, artistic ability that he has is there

17  not just from drawings but also the type of work he did

18  when he was in the shop and type of products that he's

19  able to produce is really above and beyond the standard.

20  He's just um extremely talented.  Um, I want to point

21  out that the only evidence of violence in his record is

22  the commitment offense and um he chose not to talk about

23  that today.  He's always maintained that he is not

24  guilty of this crime.  Um, since coming to prison, he's

25  done very well.  He's learned a lot, he accumulated a

1    number of vocations; he took a lot of self help.  Yes,

2    there was a nine year period when he was placed on C-

3    status due to grooming standards.  And during that

4    period of time, there is a lapse.  We don't have the

5    continuation of the same excellent programming that he

6    had prior to that but Mr. Cooks is a person of very

7    strong convictions.  And he had um, he consciously made

8    that choice and I have to say that he did use his time

9    wisely during that nine year period.  He produced a

10   comprehensive business plan.  He thought how he could

11   actually commercialize his artistic endeavors.  And when

12   asked question how he would quantify this in terms of

13   sales and so forth, he's been able to break it down and

14   talk about, well, if so much sales occur and here's the

15   taxation and here's what your net is.  He's really put a

16   lot of thought into it when you consider his relatively

17   low TAV score and what he was able to produce what he

18   was capable of doing, there's just a wide disparity

19   there.  I have to say he's a very intelligent person.

20   Um, I think too that um he has a very focused vision for

21   his company and um he is someone who is focused on his

22   future during the time the nine years that he was in C-

23   status, he thought ahead.  And this is going to be

24   something that he can rely upon when he does get out.

25   He's already contacted businesses and they've expressed

1  interest in helping him market these products that he um

2  is able to produce.  Now it is very unfortunate that the

3  letters of support he had did not get here.  He had some

4  from family and some friends and others in the community

5  but Mr. Cooks nonetheless did want to come to his

6  hearing and um, tell you that he is ready to be paroled.

7  The psychological evaluation, while the conclusion is

8  that he rates in the low end of the moderate range, the

9  psychologist goes on to say that that would be reduced

10  if he were to be active in more self help.  And thank

11  goodness that is now able to occur because only last

12  Friday he was given a docket for education.  So now he's

13  going to resume his programming and I'm sure he will go

14  full speed ahead, working towards a GED and that's just

15  going to be the beginning of his many accomplishments.

16  He has um, he has great potential.  He already has three

17  completed vocations under his belt knowing cabinetry,

18  upholstery, auto body, so he's got marketable skills.

19  Now if we look at the 115's that he's gotten over the

20  years, if we take out the 115's for grooming standards

21  then he'd be disciplinary free from 1996 to 2005 when

22  unfortunately he did pick up a 115 for being out of

23  bounds.  But Mr. Cooks says that it was reduced to a

24  128.

25          INMATE COOKS:  Yes.

1      **ATTORNEY CHRISTENSEN:**  And I'm wondering if that

2    is what the counselor refers to in here and I'm not

3    sure, in the counselor's report where the disciplinaries

4    are mentioned, there is a 128, um, July 28, 2006

5    disobeying verbal order.  Mr. Cooks, do you think that

6    is the same one?

7      **INMATE COOKS:**  Yes, I believe so.

8      **ATTORNEY CHRISTENSEN:**  Um-hum.  Authored by

9    Correctional Officer DeBarre (sp).

10     **INMATE COOKS:**  No, that one would be for um, not

11   getting down that we spoke about earlier.

12     **ATTORNEY CHRISTENSEN:**  Oh, okay.  Okay.

13     **INMATE COOKS:**  We also have that.

14     **ATTORNEY CHRISTENSEN:**  Okay.  Okay.  All right.

15   Well, Mr. Cooks is also on the waiting list for AA and

16   NA.  During the nine year period of time he was also

17   able to review the 12 steps on his own and he read on

18   his own and he did use his time wisely and productively.

19   He has a very positive attitude.  He's very soft spoken

20   and comes across as very sincere.  Um, he is definitely

21   a unique person.  Um, someone that we do not often see

22   as a putting together such a comprehensive business

23   plan, thinking ahead of all the facets of how to be

24   successful. And not only with regard to his own personal

25   ambition about the artwork and specifically how that

1    would work with marketing and so forth but he wants to

2    give back to the community.  He, as a youth, went to the

3    Boys Club in Oakland and that's where he would like to

4    return to be active mentoring other youngsters so that

5    they do not go down that wrong road.  And then finally,

6    he has, as you can see from the artwork, he has a deep

7    appreciation for his cultural heritage, which is

8    strongly reflected in his style.  So I think that Mr.

9    Cooks would be successful out in the community.  He is

10   very pro-social in his thinking and in his actions.  He

11   is someone who should at this time be returned to the

12   community. Everything is in place for him to be

13   successful.  He's not the same young man that he was

14   when he came in.  He's matured.  His judgment is good

15   and um, it's my hope that the Board can see the changes

16   that have taken place in him for the better.  So I will

17   stop at this point and let Mr. Cooks add to what I've

18   said, as to why he feels he's suitable for parole.

19        **PRESIDING COMMISSIONER BRYSON:**  And if you'd wait

20   just one moment sir.  Go ahead Commissioner.

21        **DEPUTY COMMISSIONER MOORE:**  I dug deeper in your

22   c-file and I found a modification order of the March 5th

23   of 05' out of bounds 115 reducing, reclassifying it to

24   an administrative parole violation.

25        **ATTORNEY CHRISTENSEN:**  Oh, very good.  Thanks for

80

1   checking on that.

2           DEPUTY COMMISSIONER MOORE:   I found it in a

3   separate section.

4           ATTORNEY CHRISTENSEN:   Good.

5           DEPUTY COMMISSIONER MOORE:   And that was dated

6   June 28th of 05'.   Okay?

7           INMATE COOKS:   Thank you.

8           PRESIDING COMMISSIONER BRYSON:   Go ahead Mr.

9   Cooks.

10          INMATE COOKS:   The reason why I believe I'm

11  suitable, as you would say, for parole is because my

12  belief in helping not only youth but adults in general

13  in order to interact with youths.   There's not enough

14  interaction with youths period to begin with.   I've

15  raised my son from behind a wall over a 26 year period.

16  When I left, he was only one years old and some months.

17  And I don't look at the pain that I suffered from being

18  out of his life.   I look at the pain that he's suffered

19  from me being out of his life. Although he's never been

20  incarcerated himself, I'm thankful for that for God that

21  that's never happened because of the things that didn't

22  occur to me throughout this system of mine twenty some

23  odd years in the system.   In the beginning with Alameda

24  County alone, there's so much chaos, not only in the

25  county but in the schools themselves.   Although he's out

1  of school there are many things that still occur in

2  society that affects him, more so now that he's a father

3  himself.  I have a 5-year-old granddaughter and possibly

4  another child on the way, I just found out.  If it's

5  true, bless us all due to Allah and I'm thankful for

6  that.  And hopefully that given the opportunity I know

7  that I would be successful financially in business, as

8  well in supporting the kids and helping the community.

9  My mother, as I spoken earlier, she's a diabetic.  I

10 would not like to see my mother in a home because

11 individuals don't take full account for their abilities

12 and their actions in those homes.  I been seeing it on

13 the news.  I'd rather be in a position to pay for my

14 mother's care, even if it's an in home nursing and with

15 this company, I know I will be successful and be able to

16 do that and help other kids and donate.  I have several

17 projects going now that applying with my studies and

18 everything that I plan on doing in the future, the near

19 future more so because if I continue to wait and wait

20 nothing gets done.  I was raised to, if you want

21 something done right, do it yourself.  I have took into

22 consideration of that even more so over the years along

23 with all the things that's been given to me from my

24 parents and teachers and counselors guides from schools

25 and different stuff. And now because I'm not allowed to

1  sit back and acknowledge all that instead of overlooking

2  a lot of it as a child, I've taken into consideration

3  that my mother say "wait until you have kids, this is

4  going to happen".  All those things have come true.  And

5  now I'm able to give that and use that to my abilities

6  to help kids, not only my own child.  And I do believe

7  over the past twenty-some odd years mainly the first

8  decade or so, I helped raise kids in the system keeping

9  them away from gangs, because I know what that path

10  takes.  I know where that path will take you down.  And

11  back in the 80's when I first um was committed into the

12  system it was more racial wars going on in old Folsom.

13  I didn't get involved in it because that's not me, I'm

14  not into that.  I never wanted to be violent with anyone

15  when I can speak with you.  I know how to walk away.

16  There's not a problem with walking away even though, as

17  a young kid I boxed, I wrestled, martial arts and stuff

18  like that.  That taught more discipline instead of what

19  we see, the violence of it. But you don't get the

20  discipline, the teachings and I'm going to give back in

21  that fashion to kids and adults.  Not only um the

22  individuals that I may communicate with in the system

23  here at Solano over the past year and a half or so I

24  haven't been here, the individuals I have interacted

25  with, that is the path we're on as a group.  Just a

1  couple individuals and then um Islam.  That is what is

2  preached to us.  It's not so much the negativity that

3  everyone sees because you may be standing up talking

4  with a group of peoples for a minute and they associate

5  or assume that your that and that's unfair even though

6  that's life.  But it's still unfair.  So I take into

7  consideration um the photograph that the DA um, excuse

8  me if I can't remember your name at the time, spoke of,

9  the Kumi one, the pattern.  I know that she chose those

10  two to really speak on, when I could of took those off,

11  left them in my bunk area, but why deny that when I have

12  nothing to hide.  That's not something I'm ashamed of.

13  But if I had the opportunity to go back and say, do this

14  for me?  I wouldn't do it because it's something I

15  helped perpetuate in that fashion by doing that.  You

16  know, I could create many different art pieces.  I have

17  shown that. But at that time my canteen was low and a

18  guy offered me some canteen, thirty dollars worth of

19  canteen to do that pattern.  I have no problem with

20  that.  But he had the pattern of only the warrior coming

21  out of the continent.  The rest of the work that's

22  around that one picture is still mines and it would be

23  sold as that, not a gang tat because that's not what

24  it's about.  They just took from that.  You can't write

25  a book and expect someone to take the entire book to

1  heart.   They going to take what they feel suits them and

2  I see that in that fashion and that's how I see life in

3  general.   I plan on taking what I've learned, what I've

4  gained, to the heart and deal with society in that

5  fashion legally and be successful.

6       **PRESIDING COMMISSIONER BRYSON:**   Thank you sir for

7  your remarks.   We will recess for deliberations.   The

8  time is now 15:47.

9

10                    R E C E S S

11                    --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

85

1     CALIFORNIA BOARD OF PAROLE HEARINGS

2     D E C I S I O N

3     **DEPUTY COMMISSIONER MOORE:**  We're on record.

4     **PRESIDING COMMISSIONER BRYSON:**  All right.  And

5     this is a reconvening for the decision in the matter of

6     Harry Cooks and the time is now 16:22 and all parties

7     have returned to the room.  Sir, the panel reviewed all

8     information received from the public and relied on the

9     following circumstances in concluding that you are not

10    yet suitable parole and would pose an unreasonable risk

11    of danger to society or threat to public safety if

12    released from prison.  This offense was carried out in

13    an especially cruel and callous manner in that on August

14    11th of 1983 the victim Edgar Ellis, a 64-year-old male

15    was particularly vulnerable because of his age and he

16    was unarmed in his home when the inmate and crime

17    partners, never identified, strangled him and ransacked

18    his home taking the safe, money, marijuana and stereo

19    equipment.  The inmate was identified in the home

20    controlling the victim before the murder and later on

21    the steps leaving the home.  The inmate bragged to two

22    separate witnesses about participating in the

23    robbery/murder.  Investigators discovered the victims

24    reel-to-reel recorder taken in the robbery inside the

25    **HARRY COOKS        C-84354    DECISION PAGE 1        8/08/07**

1   inmates home.  This offense was carried out in a

2   dispassionate and calculated manner.  The victim

3   suffered a protracted beating.  A sweater used to

4   strangle the victim could have been used to coerce

5   information about the location of drugs and money, as

6   well as the combination to the safe, which was

7   ultimately removed from the home.  As to prior

8   criminality, sir you did begin the marijuana use at an

9   early age of 13 and you did suffer poly-substance abuse.

10  Your prior criminality showed an escalating pattern of

11  criminal conduct.  You, as a juvenile suffered probation

12  for burglary and then as an adult again, burglary

13  probation, possession of marijuana, less than an ounce

14  and then possession of marijuana greater than an ounce

15  and you were on probation at the time of the commitment

16  offense.  And you did time in county jail.  As to your

17  institutional behavior, it has been variegated, I would

18  say, um, you have had some commendable programming and

19  you've had some limited programming.  You did achieve

20  your GED.  You're currently um, enrolled for ABE um, in

21  1998 to basically August of this year you were on C-

22  status so there was a hiatus during which you basically

23  were not able to program.  Prior to that you achieved

24  vocations in milling cabinetry, upholstery and auto body

25  **HARRY COOKS**        **C-84354**      **DECISION PAGE 2**      8/08/07

1  um, in the 90's, early 90's.  Um, and in 89' to 90' you

2  were involved in printing and 96' and 97' in carpentry.

3  As to your self help you are currently, by your own

4  testimony here today, on the AA NA waiting list.

5  However, when questioned you really have not

6  internalized the steps yet or any steps for a program.

7  Um, you did participate in the parole recidivism

8  prevention program but that again was a significant

9  period of time ago.  As to 115's, you do have 14, seven

10  of which were for grooming standards, which has been put

11  aside.  And the most recent the 2005 out of bounds 115

12  was reduced to administrative rules violation.  So you

13  have been discipline free for a number of years and are

14  showing a positive behavior in that regard. As to the

15  psychological report dated June 24th, 2005 by Dr.

16  Richard Starrett, he assessed you on the low end of the

17  moderate in all factors involving a propensity for

18  violence, which is not a clear recommendation for

19  parole.  He did assign you a fairly high global

20  assessment of functioning of 85.  As to parole plans,

21  you were not able to present any viable residential

22  plans nor employment plans to this panel today.  You did

23  state that you had made preparations and have plans

24  basically in the mail but none were arriving here today,

25  **HARRY COOKS        C-84354    DECISION PAGE 3        8/08/07**

1  which is very unfortunate but it was not the only thing

2  or even the major thing on which we based our decision

3  today.  As to Penal Code 30-42 responses, responses

4  indicate opposition to finding of parole suitability

5  specifically by the District Attorney of Alameda County.

6  In a separate decision, the hearing panel finds it is

7  not reasonable to expect that parole be granted at a

8  hearing during the following three years.  Specific

9  reasons for this finding are as follows.  This offense

10  was carried out cruelly and callously.  On August 11th

11  of 1983 the victim Mr. Edgar Ellis a 64-year-old male

12  was particularly vulnerable because of his age and he

13  was unarmed in his home when you and your crime

14  partners, never identified, strangled him and ransacked

15  his home, taking the safe, money, marijuana and stereo

16  equipment.  You were identified in the home controlling

17  the victim before the murder and later on the steps

18  leaving the home.  You bragged to two separate witnesses

19  about participating in the robbery/murder.

20  Investigators discovered the victim's reel-to-reel

21  recorder taken in the robbery inside your home.  This

22  offense was carried out dispassionately and in a

23  calculated manner.  This victim was abused.  He suffered

24  a protracted beating.

25  **HARRY COOKS        C-84354    DECISION PAGE 4      8/08/07**

1   A sweater used to strangle him could have been used to

2   coerce information about the location of the money and

3   drugs, as well as the combination to the safe, which was

4   ultimately removed from the home.  Moreover, this

5   offense was carried out in a manner demonstrating

6   exceptionally callous disregard for human suffering.

7   Strangling death is a terrible way to die.  As to the

8   motive for this crime, it was very trivial in relation

9   to the offense.  It was basically robbery.  And you sir

10  deny the murder.  You did admit to receiving stolen

11  property.  This was a murder first.  This commitment

12  offense was a terrible heinous crime that you deny

13  committing and we are left sir with what we have in the

14  documentation and the evidence.  Basically you are

15  showing no insight or remorse into this crime and

16  therefore, you're not showing this panel that you have

17  any understanding of the nature and magnitude of this

18  crime and therefore you remain unpredictable and a risk

19  to public safety.  Sir, you are highly talented.  During

20  this last decade you've elected not to program in order

21  to show your parole suitability and you need to re-

22  energize now your self help programming.  You need to

23  stay discipline free.  Document your parole plans and we

24  are requesting a new psychological evaluation prior to

25  **HARRY COOKS        C-84354    DECISION PAGE 5      8/08/07**

1   the next Board hearing.  Sir, I hope that you will also,

2   besides programming, I hope you'll get back on track

3   with that but basically sir this is a fairly narrow

4   scaped, narrow scoped rather, narrow scoped world in

5   which you're operating right now.  The world at large is

6   very much broader scoped but this is not.  And you

7   basically know what it's going to take for you to get

8   out of here but you need to work on that really hard and

9   you need to work within the scope and the parameters, if

10  you will, of this prison.  Your artistic reach goes far

11  and wide.  There's no doubt about it.  And you have

12  great potential there.  And I hope personally that

13  you'll get the opportunity to realize that potential

14  because it's large and I'd like to invite the

15  Commissioner to add anything you'd like.

16        **DEPUTY COMMISSIONER MOORE:**  Thank you.  Mr. Cooks

17  um, I mentioned when I was talking with you, you had

18  mentioned that your classification has changed and the

19  door is now open for programming in any way, shape or

20  form. Whether its substance abuse programs, stress

21  management, anger management, communication awareness,

22  anything like that.  And during the time that you have

23  between now and the next hearing anything you can be on

24  the waiting list for, anything you can sign up for, not

25  **HARRY COOKS        C-84354    DECISION PAGE 6        8/08/07**

1    just to sign up but to bring yourself to it.  Even if

2    you did it before in the late 80's and early 90's and

3    see if there's something more that can be harvested from

4    those groups, from either the leaders or from the other

5    men who attend.  Not only to do for others, but to see

6    what you can bring back for yourself for personal

7    growth.  You have to be one of the most talented people,

8    not inmates, people I have ever met.  Not only in your

9    artwork but looking at your auto body work, there's some

10   good body work going on in the pictures that you showed

11   us.  The upholstery, my family was involved in the

12   upholstery business peripherally and I understand how

13   hard that is. And that roll top desk that you have a

14   picture of in your portfolio, all of those things are

15   phenomenally creative work.  And your artwork also just

16   continues on that vein.  And you happen to have, from my

17   perception, an ability to capture the spirit of the

18   human body in some of your work, especially on the head

19   pictures of the women.  Um, you catch their spirit.

20   That's a gift that no one can teach you.  I encourage

21   you to follow and work hard in your education to obtain

22   your GED and if you do have dyslexia there are skills

23   and I used to be a Special Ed teacher, there's tricks of

24   the trade so that you can become a good reader.

25   **HARRY COOKS**        **C-84354**    **DECISION PAGE 7**      8/08/07

*WPU Inc*

1  Your math skills, I was looking at some of the

2  measurements and three dimensional drawings in your

3  portfolio, you have math skills.  You just need to learn

4  some of the vocabulary and the words to go with them.

5  It will help you grown as a businessman should you

6  receive a date.  I encourage you and I encourage you to

7  interact with others and to develop and build a

8  community and to bring those and show us those skills

9  the next time you come before the panel.

10          INMATE COOKS: Thank you.

11          DEPUTY COMMISSIONER MOORE:  Good luck.

12          PRESIDING COMMISSIONER BRYSON:  We're denying

13  your parole for three years.  We'll place you on the

14  2010 calendar.  The Board recommends no more 115's or

15  128-A's.  Get self help, earn positive chromos and we

16  are ordering a new psychological evaluation for BPT form

17  1000-A.  That concludes this hearing.  The time is

18  16:32.

19          ATTORNEY CHRISTENSEN:  Take Care.

20          INMATE COOKS:  Thank you.

21          DEPUTY COMMISSIONER MOORE:  Thank you sir.

22          PRESIDING COMMISSIONER BRYSON:  Good luck to you

23  sir.

24          INMATE COOKS:  You too.

25  HARRY COOKS        C-84354    DECISION PAGE 8        8/08/07

1

2                    A D J O U R N M E N T

3                         --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    PAROLE DENIED FOR THREE YEARS

22    THIS DECISION WILL BE FINAL ON:____DEC 0 6 2007____

23    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,

24    THE DECISION IS MODIFIED.

25    HARRY COOKS        C-84354    DECISION PAGE 9      8/08/07

94

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Emilie J. Howard, as the Official Transcriber, hereby certify that the attached proceedings:

| | | |
|---|---|---|
| In the matter of the Life | ) | CDC Number: C-84354 |
| Term Parole Consideration | ) | |
| Hearing of: | ) | |
| | ) | |
| HARRY COOKS | ) | |
| ——————————————— | ) | |

CALIFORNIA STATE PRISON, SOLANO

VACAVILLE, CALIFORNIA

AUGUST 8, 2007

14:09 P.M.

Were held as herein appears. Further, this transcript is a true, complete and accurate record, to the best of my ability, of the recorded material provided for transcription.



Emilie J. Howard
September 16, 2007
WPU Inc.

STAFF PSYCHOLOGIST REPORT DECLARING PETITIONER
NOT TO BE A THREAT OR DANGER TO SOCIETY


E X H I B I T    " B "

Life-Term Inmate Evaluation for the Board of Prison Terms
MENTAL HEALTH EVALUATION

FOLSOM STATE PRISON

PSYCHOSOCIAL ASSESSMENT

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| NAME: | Cooks, Harry |
| CDC #: | C-84354 |
| AGE: | 42 years |
| DOB: | 01/03/63 |
| MARITAL STATUS: | Divorced |
| RACE: | African American |
| SEX: | Male |
| RELIGION: | He believes in all religions |
| DATE OF REPORT: | 06/24/05 |

This report is based on review of the inmate's medical file, review of his C-file, prior Board of Prison Terms reports, prior psychological evaluations, current classification information and probation officer's report. The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview. The following information is accurate to the extent that the records and the inmate's self-report are accurate. As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Prison Terms psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date. The inmate was interviewed for approximately 1 hour and the inmate's file was reviewed for approximately 4 to 6 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Prison Terms to assist in determining his eligibility for parole. The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify under the American's with Disabilities Act; the evaluation was conducted by a licensed clinical psychologist.

The inmate is 6'2" tall African American male who weighs 216 pounds, with thick black hair.

The inmate's crime occurred on August 11, 1983. He was received into California Department of Corrections in 1984. He was 20 years old when the crime occurred. He was convicted of a PC §187 murder in the first degree. He received a 25 years to life sentence. Minimum eligible parole date is October 23, 1999. He has served 22 years. His initial board was in 1998 and 1998. This is his third subsequent, according to his account.

The inmate states that, programming wise, the Board would like him to upgrade himself vocationally and stay involved in self help. The inmate has had no current disciplines. He has had a total of twelve 115's, the last one was in 1999. He did have a 128 in March for being out of bonds. Most of the 115's were for grooming standards. The most serious 115 was in 1994 for stimulants and sedatives.

The inmate has had some educational upgrades. He has done some correspondence, self help, and business courses. He plans to continue with business courses in the future. Vocationally, he has completed upholstery, mill and cabinetry, auto body, carpentry, and he is currently unassigned. He plans to do auto body and artwork in the future. The inmate is not active in AA or NA at the current time. He states that he completed a 1 1/2 year alcohol and drug treatment program. He does not know if he is going to do AA or NA when he is on the street. He is active in his religion and claims to do that on the street. He has taken about seven or eight self help groups. He is not in any self help groups at the current time, but plans to do that on release. He would also like to work with children when he is released.

## II. DEVELOPMENTAL HISTORY:

The inmate was born in Mobil, Alabama. He denies any prenatal or birth complications, or birth defects growing up. He states that his development in terms of crawling, walking, talking, learning, and emotions were all within normal limits. He states that he did have ulcers and stomach problems as a child. There are no abuse or trauma issues in his childhood.

## III. EDUCATION:

The inmate completed the 11th grade and went on and did some junior college work. He had no learning problems and states that later on it was discovered that he was dyslexic and was a slow learner. The inmate was suspended from school and used marijuana during his high school years. He also had a few fights.

The inmate's TABE score was 3.2. He has had some educational upgrades.

## IV. FAMILY HISTORY:

The inmate was raised between Alabama and California by his natural parents who divorced when he was 14 years of age, and he was raised by his mother after that. He is the fourth of five children. The family lived in several residences while he was growing up. There were no out of home placements. His father worked as a welder and his mother was a homemaker. He had an okay relationship with his father and a good relationship with his mother. He has a good relationship with both parents now. The inmate denies any health problems in the home while he was growing up. There was no use of alcohol or drugs in the home and no mental health problems in the home. His brother has an arrest history. There was no spousal abuse, there was no emotional, physical or sexual abuse of the children.

The inmate states that he has letters in the file from friends and family.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

The inmate states that his first sexual encounter was at the age of 14 or 15. He has had about 8 sex partners and 2 serious relationships. He describes his sexual orientation as heterosexual in nature. He denies any crimes against women or children. He denies ever being accused of any sex related crimes. He denies any high risk behavior.

## VI. MARITAL HISTORY:

The inmate states that he has been married one time for four years and has a son out of that relationship. He has no plans for future relationships at the current time.

## VII. MILITARY HISTORY:

The inmate has no military history.

## VIII. EMPLOYMENT/INCOME HISTORY:

The inmate states that he never had a steady job while on the street. He denies ever being terminated from a job, or ever receiving public assistance or Social Security Disability.

The inmate has developed some vocations while incarcerated.

## IX. SUBSTANCE ABUSE HISTORY:

The inmate states that he has never tried or used alcohol. The inmate states that he was 13 when he began smoking marijuana. He has an arrest for this, but neither drugs nor alcohol was involved in his case. He has never been involved in treatment while on the street. He was briefly involved in treatment while incarcerated.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Medical:

The inmate states that he had asthma in the past, but outgrew it. He has had about three strokes and the last one was approximately a year ago. He also has carpal tunnel syndrome. He denies any surgeries. The inmate states that last year when he had the stroke, he fell and hit his head and there was a head injury. He has numbness in his fingers which continues. The inmate states that his mother has diabetes and at one time he was treated for tuberculosis. He denies any disabilities and states that his health is fair.

Mental Health:

The inmate has no prior diagnosis or treatment for mental health problems, no prior psychiatric hospitalizations, and has never been on psychotropic medications.

## XI. PLANS IF GRANTED RELEASE:

The inmate would like to return to Oakland. He has family and a job offer in that area. He would also like to help kids in that area, and he plans on being connected with the Church and the Boys' Club, and own his own company.

## CLINICAL ASSESSMENT

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

The inmate was oriented by person, place and time. He was alert and cooperative. He had no unusual physical mannerisms. His gait and posture were normal. His simple registration was intact, but there was impairment in terms of his short-term memory. He could only remember one of three words across time. He could do simple math in his head. His simple abstract thinking was intact. His complex problems solving abilities were weak.

At the current time, he denies any problems with depression, anxiety, mood swings or mood disorder. He denies any auditory or visual hallucinations. He denies any delusional

or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

## DIAGNOSTIC IMPRESSIONS DSM-IV:

| | | |
|---|---|---|
| **AXIS I** | V71 | Adult Antisocial Behavior. |
| | | Marijuana Abuse. |
| **AXIS II** | | No Diagnosis. |
| **AXIS III** | | Ulcers, strokes, and numbness in fingers. |
| **AXIS IV** | | Psychosocial Stressors: Due to incarceration. |
| **AXIS V** | | Global Assessment of Functioning (GAF): 85. |

The inmate is currently in the General Population and has never been a member of the MHSDS system while incarcerated. He is not currently active in AA, NA, or mental health groups.

## XIII. REVIEW OF LIFE CRIME:

The inmate was convicted of PC §187 murder in the first degree and robbery PC §211. He is serving 25 years to life sentence with a minimum eligible parole date of October 23, 1999.

Summary of the Crime:
The following summary of offense is submitted by Senior Deputy District Attorney: On August 11, 1983, the inmate and some other associates strangled a 64 year old victim and ransacked his home taking his safe, money, marijuana, and stereo equipment. The inmate was identified in the home controlling the victim before the murder and later on the steps leaving the home. He bragged to two separate witnesses about participating in the robbery/murder and a search warrant of his home turned up a reel to reel tape recorder which had taped the robbery. An autopsy revealed numerous injuries to the victim, consistent with a protracted beating. The sweater used to strangle the victim could well have been used to coherence information about the location of money and drugs, as well as the combination of the safe, which was moved from the house.

Inmate's Version: The inmate discussed the offense, but did not submit a written statement. He admitted that he accepted stolen property, but denied committing the murder. He stated that he did not know the victim personally, but he knew from individuals on the street that he sold marijuana. On the evening of the offense, he left the home of a friend and was walking by the victim's house when he saw some people on the

stairs, including the co-defendant who called him over and asked him if he wanted a reel to reel tape. He took the tape knowing that it was probably stolen, but did not give it much thought. He then went to a friend's house and spent the night. He stated that the jewelry found in his house he had received from trading marijuana. He added that if he had stole items from the deceased, he would have had more than a reel to reel tape in his home. He stated that he would not voluntarily accept a deal because he was not guilty. He decided that they would have to find him guilty and give him time. He believed that the witness lied, but since he has been convicted he will do his best to keep his mind and body healthy while incarcerated. He looks forwarded to getting out and being with his family.

Aggravating Factors: The crime resulted in the death of the victim. The victim was an elderly man. The manner in which the crime was carried out indicates premeditation. The crime involved an unknown quantity of contraband. The inmate's prior records, as a result are increasingly serious.

Mitigating Factors: None.

The inmate had a juvenile arrest history beginning at the age of 17 for burglary. He was also arrested for petty theft. He was dismissed from juvenile probation on June 12, 1981. The inmate's adult history consists of burglary, which occurred in 1982. He was also convicted in 1982 for possession of less than one ounce of marijuana. He was also convicted in 1983 for possession of more than one ounce of marijuana and was only sentenced to 18 months.

When asking the inmate about his version of the crime, he denies that he was there and the case is in appeals. He said "they group me with the individuals that were in that area. It was a stupid crime whoever did it."

When asking the inmate what has changed about him, he says that something like this would not happen again. He states that he has grown and he is learning that you need to have employment on the street and that you cannot be using alcohol and drugs, and you have to watch who you are hanging out with. He plans to be very active when he is out there. He has his own company and wants to be active in the Boys Club. He states that he is not going to have time for crime. He said that he has created his own job.

## XIV. ASSESSMENT OF DANGEROUSNESS:

In order to determine the inmate's risk of representing a substantial danger of physical harm to others, he was assessed on a number of research derived risk factors that are associated with an increased risk for future violence.

History of Violence:

According to the probation officer's report, the inmate's arrest history was increasing and this would be an aggravating fact. In rating this individual on the historical factors, he would rate in the low end of the moderate range in terms of his likelihood to commit future violent acts when compared to other inmates with similar crimes. This is based on the fact that his young age at the time of his first violent act. He was not stable in his employment or relationships. There was limited use of substances that is marijuana. He had several arrests in that area, and he had had several attempts on probation, but kept getting into trouble.

Prior Performance on Supervised Release:

The inmate had been on probation prior and his arrest history increased.

Inmate's Compliance with Board Requests and Treatment:

The inmate has been compliant from a disciplinary standpoint with the Board's requests since 1999. He did have a violation in 1994 for stimulants and sedatives. In 1984, two weapons were found in his cell. The inmate has upgraded himself vocationally and educationally, which is his strong point. He has done some self help, but needs to do a lot more. He is not active in AA or NA. He needs to be active in AA and NA continuously.

Substance Abuse:

Relapsing in the use of marijuana may be a concern. He has been clean for many years, however, he is not in treatment.

Mental Health Issues:

The inmate, at the current time, is placed in the general population and has never been in the mental health system. He does not appear to have any complicating mental health problems.

Clinical/Insight:

The inmate continues to believe that he is innocent. There is a discrepancy between the record and his account. Moreover, he was found guilty by a jury trial.

In rating this individual in the clinical/insight factor, because of the above uncertainty, his lack of insight must be noted along with his lack of response to treatment in terms of AA, NA, and not being in self help currently. The inmate would rate in the low end of the moderate range in his propensity for future violence.

Environmental Risks/Risk Management:

The inmate's parole plans seem to be well developed. Information needs to be verified regarding his own business and the feasibility of this. He does appear to have support and other job offers out there. He needs to establish a sponsor for AA or NA in the community.

The inmate would rate in the low range to the low end of the moderate range in terms of his risk management for the future. This rating is influenced by the inmate's noncompliance in terms of disciplines and the fact that he has only been discipline free since 1999, his non-compliance with alcohol and drug treatment, and the fact that he could be more active in self help.

In summary, this individual overall appears to rate in the low end of the moderate range on all factors in his propensity to commit violence the future when compared to similar violent inmates. This rating would be reduced if the inmate is constantly active AA and NA, more active in self help, remains discipline free, and clarifies his case.

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

The inmate needs to be continuously involved in self help, AA and NA, continue to positively program and remain discipline free, and clarify his case.

Thank you for the opportunity to assist in this interesting consultation.

_____          6-23-5
RICHARD STARRETT, Ph.D., Ph.D.              Date
Contract Psychologist, CA License PSY 13628
Folsom State Prison

RS/ls

Cooks, Harry                    PAGE 8          MENTAL HEALTH EVALUATION

VERIFICATION OF JOB AND FAMILY SUPPORT

E X H I B I T    " C "

**AQBULON ENTERPRISES**

Dear Investor,

I am Mr. Harry Cooks, and I represent Aqbulon Enterprise Chu Bao Production of by "G" and Associates.  Aqbulon, Chu Bao Production by "G" is a business of heritage.  The African culture has many looks of beauty such as those deep unspoken words which Chu Bao designs and artistic illustrations reveal.  It is our opinion that beauty of this magnitude should be shared with the rest of the world.

We will make our artistic illustrations and unique designs available through the many different lines offered at affordable prices.  We are so confident our business will accomplish the goals set, that we plan on reinvesting the profits back into the core business.  We envision rapid growth from increasing demand for our many lines of products.  Initially, we will require limited staffing, equipment, supplies, materials, and accomodating working space.  Advertising cost will also be maintained at a minimum.  Consequently, overall operating cost will be kept at a minimum.

The afforementioned well thought out phases of our business enables us to reach out to potential investors in order to attain our minuscule initial capitalization.  This start-up capital will allow us to begin the process of making our products available to all.  The profits required will allow for a great return on investments and the continual building of the business is the fulfillment of a lifetime dream.

We invite you to peruse the accompaning Executive Summary and Business Plan.  After thorough examination of our profit potential and creative products, we hope you will join us in this most wonderful venture.  It is our belief that your decision to invest in Aqbulon Enterprise will be very enjoyable and properous for you.

Please contact us at_____,
for any questions or further informatio you may require.  we welcome your comments.

Sincerely,

Harry Cooks
Chief Executive Officer
Aqbulon Enterprises

# AQBULON ENTERPRISES

Business Plan

Executive Summary

The illustrations and designs of CHU BAO Productions offers the total artistic experience to every consumer through the many different looks of beauty contained in each line of creations. These illustrations and designs have been painstakingly created by "G" of CHU BAO Productions over the course of many years. It has indeed been a labor of love in the truest sense. CHU BAO believes so deeply in the innate beauty and strength of the African culture. We believe it should be shared with all.

At AQBULON ENTERPRISES, we are committed to making CHU BAO's artistic illustrations and unique designs portraying the constant theme of strength and beauty available to our customers. The focus of AQBULON ENTERPRISES, is specially directed to the African- American community, but we are definitely diverse in our thinking. The different lines of creations we offer will be comparatively low priced and very affordable to all.

With our minimum staff and dedicated corporate officers, we will accomplish all of our goals. It is management's commitment to operate our business with minimum operating cost, equipment, and materials. Thereby, allowing us to reach our maximum profit objective. We plan on reinvesting our profits back in to the core business. Rapid growth is expected by increasing in-volume demand, all within the first fiscal business year.

AQBULON ENTERPRISES will be incorporated in Arizona and centrally located in Northern California. In our efforts to provide consumers with the beautiful unspoken words that CHU BAO's artistic illustrations and unique designs reveal, we will offer these lines of creations; Black Beauty, Pure Innocent, Secret Fantasy, Acquired Taste, The Heritage Line, and the Pride of Brotherhood, just to name a few. The illustrations and designs are created through many different mediums to enhance the visual experience of our customers. The different types of creations can be transfixed to other products such as common household furniture, hanging paintings, posters, pictures, throw pillows, stationary, including all types of greeting cards, business cards, post cards, and calendars, to name a few.

We at AQBULON ENTERPRISES are very excited about this opportunity to enhance the artistic experience and bring awareness of beauty and strength of the African Culture to our customers. Join us!!

AQBULON ENTERPRISES

EXECUTIVE SUMMARY

## Table of Contents

### Business Description
Business Concept
Business Name
Goals
Industry Analysis
Form of Ownership
Facility Requirements
Legal Requirements

### Marketing Plan
Geographic Market
Customer Profile
Competitive Analysis
Pricing
Promotion

### Management Plan
Employees
Organization Chart
Resumes
Business Expertise

**<u>Financial Plan</u>**
Initial Capitalization

# BUSINESS DESCRIPTION

## Business Concept

The African Culture has many looks of beauty such as those deep unspoken words of CHU BAO artistic illustrations and unique designs. Those designs will be offered at a fair and reasonable price. These designs will inspire the customer and enhance the locations which the creations are presented by them.

## Business Name

The name of the corporation is AQBULON ENTERPRISES. The name AQBULON is a name of African Heritage. The name of the exclusive design lines will be CHU BAO Productions. That name comes from the creator of the products, CHU BAO. It literally means precious jewel.

## Goals

The successful expression of African Culture for the enhancement of the customer. The visual representation through the creativity of CHU BAO will always contain the theme of strength and beauty. AQBULON ENTERPRISES desires to make these creations affordable and available to all customers.

## Industry Analysis

There are limited companies providing the kind of product lines we are offering. In fact, there are absolutely no competitors providing our unique creations. Even though the industry is limited, the potential for expansion is great. We at AQBULON ENTERPRISES believe, though the effective use of marketing and "word-of-mouth" strategy, we can widen the industry and ensure long term profitability.

## Form of Ownership

A Corporation.

## Facility Requirements

Rental space sufficient for; living, an executive office, two work stations, printing, packaging, distribution, storage of products, and other space as needed.

(1)

## Legal Requirements

Only legal requirements are incorporation,tax,copyrights, and patent law counseling.  On an as needed basis, funds will be allocated to pay for those and other legal requirements.

## MARKETING PLAN

## Geographic Market

AQBULON ENTERPRISES will be incorporated in Arizona and centrally located in Northern California.  Initially, we will seek a customer base in the United States.  Our marketing thrust will be limited and effective.

## Customer Profile

The focus of AQBULON ENTERPRISES is specifically directed to the African American Community, but we are definitely diverse in our thinking. Our customer need not be economically overly indulgent because our product lines are comparatively low priced and very affordable to all.  Our preferred customer is certainly Afro-centric with an emphasis in representing his/her culture through artistic means.

## Competitive Analysis

AQBULON ENTERPRISES will not be in direct competition with any other corporation.  Our product lines are very unique and not available anywhere else.  There are, however, others who sale artistic products, but we are confident those entities will pose no threat to our profit line or customer loyalty.

## Pricing

The prices of our products will be commensurate with other well designed artistic works available to the public.  The management at AQBULON ENTERPRISES are committed to offering our designs and artistic illustration at a fair and reasonable price.  Thereby, allowing our customers of any economic level the ability to make purchases from us and participate in what we know to be a culture revealing experience.

## Promotion

It is our position at AQBULON ENTERPRISES that the African Culture has many looks of beauty and the experience of having our designs and illustrations will culturally enrich our customers. We will utilize websites and classified advertising in at least one hundred and thirty cities to get our product lines in the public domain. Once out there, we rely on the, true and tested, long held convention of word of mouth to circulate interest in our products.

## MANAGEMENT PLAN

## Employees

Initially, we envision minimum staff to accomplish our goals. We forsee a website designer/operator, processing and shipping workers, and an administrative assistant. None of these five employees will command a large salary. Thereby, allowing our management team to stay committed to minimizing operational cost.

## Organization Chart

The corporation will be organized with Chief Executive Officer at the head and as such, he/she will be the final decision maker. The Chief Operations officer will be second in command and as such he/she will report directly to the CEO. The Chief Financial Officer will be third in command and as such, he/she will report to the COO and CEO. Initially, these three Officers will represent the organization and carry out the corporation's mission.

## Resumes

The resumes of all officers will be on file at the corporation's headquarters.

## Business Expertise

The Chief Executive Officer has over twenty years of expertise in the field of artistic designs and illustrations. His work is very unique

(3)

and high quality.  The actual inner workings of the business will be kept relatively simple, thereby allowing for limited experience in that area.

FINANCIAL PLAN

## Initial Capitalization

We at AQBULON ENTERPRISES plan on very limited start-up capital. Because we have well thought out every phase of our business, we are confident that we can raise the minuscule amount necessary to start conducting the business.  The renting of the facility, the purchasing of the materials, the payment of out-sourcing, i.e., the printing, and the payment of wages have all been accounted for.  That total amount is minor and certainly attainable, even through out of pocket expenditure.

March 12, 2007

Mr. Harry Cooks C-84354
P.O. Box 15-G-4M
C-S-P Solano
Vacaville, Ca 95696

Dear Board of Prison Terms:

I am writing this letter in support of Mr. Harry Cooks. I have known Mr. Cooks for over 30 years and I am willing to provide community resources upon his release from prison. I am currently working in the field of social work and I have had the experience and opportunity to provide services and resources to parolees in the County of Alameda.

I have 15 years of work experience in the field of community social work. I have provided educational, mental health, employment, and vocational resources to parolees throughout the San Francisco/Oakland Area. I have developed contacts with Laney Community College/Project Bridge Program and EOPS Program in Oakland, Ca. In addition, I've researched and found that the Oakland Parolee Reentry Roundtable will be great resource for Mr. Cooks once he returns to society. The Oakland Parolee Reentry Roundtable Program is under the leadership of the Urban Strategies Council.

I believe that Mr. Cooks has been rehabilitated and has made change in his life and decision-making. I feel that with community resources and continued support, he will become a positive role model to his family, friends, and community.

Sincerely,

Brian McGhee, MSW
Social Worker

April 24, 2007


Mr. Harry Cooks C-84354
P.O. Box 15-G-4M
C-S-P Solano
Vacaville, Ca 95696

Dear, Mr. Chairman

I am writing this letter on behalf of my brother Harry Earl Cooks #C-84354. As you are
aware my brother has been in jail since 1982. I truly believe he is sorry for his crime, and
has had enough time to think about the bad choices that put him behind bars, and in jail,
and away from his son, friends, and family.

Despite the mistakes my brother has made if paroled I do believe that my brother could be
a help to the community and to kids in danger of making the same mistakes that he to
made.  During his time in DVI  he has spoke to a group of teenagers in a straight life
program offered by DVI State Prison, about good and bad choices, choices to make and
choices not to make, how not to end up in prison next to him.

While in prison my brother has spent his time wisely he has started his on business to
provide a job for him, and also his son, family and friends.  If paroled he can be a
productive citizen with the help of his family and of his friends.

Sincerely,

*Frank Cooks Sr.*

Frank Cooks Sr.

I think Harry and the many men and women similar to him who wants to pave the way for a positive future for themselves can be a supportive resource in directing the conversation in what is needed to create a sustainable peace in Oakland.

Yours truly.
Keith T. Dodds

COUNSELOR'S BOARD REPORT FOR BOARD HEARING

E X H I B I T    " D "

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2007 CALENDAR

COOKS, HARRY                                          C-84354

I.    COMMITMENT FACTORS:

    A.    Life Crime:

        Murder First Degree, Penal Code (PC) 187, count one and Robbery, PC 211, count two. Alameda County Superior Court Case Number: 77583. Sentence: 25 years to Life. Received California Department of Corrections and Rehabilitation (CDCR) on April 18, 1984. Minimum Eligible Parole Date (MEPD): October 23, 1999. Victim: Edgar Elli, age: 64 years old.

        1.    Offense Summary:

            The following summary of the offense was submitted by Charles E. Fraser, Senior Deputy District Attorney. On August 11, 1983, Harry Cooks and some other associates strangled 64 years old Edgar Ellis and ransacked his person and home, taking his safe, money, marijuana, and stereo equipment. He was identified in the home controlling the victim before the murder and later on the steps leaving the home. He bragged to two separate witnesses about participating in the robbery/murder. A search warrant on his home turned up a reel to reel tape recorder, taken in the robbery.

            "The autopsy results showed numerous injuries to victim consistent with a protracted beating. The sweater used to strangle the victim could well have been used to coerce information about the location of money and drugs, as well as the combination of the safe, which was ultimately removed from the house."

            This information was taken from the Probation Officer's Report (POR), pages 3, and 4.

        2.    Prisoner's Version:

            The defendant discussed the offense but did not submit a written statement. He admitted accepting stolen property but denied committing murder. He stated that he did not know the victim personally but he knew from individuals on the street that he sold marijuana. The evening of the offense he left the home of a friend and was walking by the victim's house when he saw some people on the stairs including a Charles who called him

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2007
PAGE 2

over and asked him if he wanted a reel to reel tape. He took the tape knowing it was probably stolen but didn't give it much thought. He then went to a friend's house and spent the night. He stated that the jewelry found in is house he had gotten through trading marijuana. He added that if he had stolen items from the defendant, he would have had more than a reel to reel tape in his home. He stated that he would not voluntarily accept a deal because he was not guilty. He decided that they would have to find him guilty and give him time. He believed the witnesses lied, but since he has been convicted, he will do his best to keep his mind and body healthy while incarcerated and look forward to getting out and being with his family.

3.     Aggravating & Mitigating Circumstances:

    a.     Aggravating Factors:

      1.     The crime resulted in the death of the victim.
      2.     The victim was particularly vulnerable due to being an elderly man of age 64.
      3.     The planning and sophistication with which the crime was carried out indicate premeditation.
      4.     The crime involved an unknown quantity of contraband.
      5.     The defendant's prior convictions as an adult are of increasing seriousness.

    Information was taken from page 7 of POR.

    b.     Mitigating Circumstances:

    There are no mitigating circumstances.

B.     MULTIPLE CRIMES:

    N/A.

II.     PRECONVICTION FACTORS:

A.     Juvenile Record:

Subject was 17 years of age when first arrested on April 10, 1980 by Oakland Police Department for Burglary. He was granted probation for the offense on June 25, 1980. On May 17, 1980, he was arrested by Oakland Police Department

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2007
PAGE 3

for Petty Theft. The matter was dismissed on May 29, 1980 and he was dismissed
from Juvenile Probation on June 12, 1981.

Source Document is page 3 of the POR.

B.    Adult Convictions and Arrests:

Subject was convicted of Burglary on June 29, 1982 and was sentenced to 12
months court probation and 180 days jail, suspended. Subject was convicted on
June 24, 1982 for Possession of Less Than one (1) Ounce of Marijuana and served
three days county jail. Subject was convicted on August 8, 1983 for Possession of
More Than One (1) Ounce of Marijuana and was sentenced to 18 months court
probation, 6 months county jail, suspended, and a $100.00 fine.

Information was taken from page 3 of the POR.

C.    Personal Factors:

Family Background: The defendant was born in Alabama and raised in Oakland,
California. He is the third of five sons born to Flemon and Melvina Cooks. The
family moved to Oakland in the late 1960's. His father obtained work as a welder
and continued to provide financial support for the family following his divorce in
1976. For 17 years, while married to his father, his mother was a housewife.
Following the divorce in 1976, she obtained part-time work in a Laundromat and
received AFDC. She is presently disabled and supported by SSI benefits. Prior to
his arrest, the defendant and two brothers resided with the mother. He indicated
his brother Charles Cooks, age 22, suffered an arrest for Possession of Marijuana.
He believed his other brothers have no arrest history.

Education History: The defendant was educated in public schools. He completed
the eleventh grade at McClymonds High School. His grades were below average,
but his attendance and behavior were considered good. He was described as
having artistic ability. He also played football and was on the wrestling team. At
age 18, he attended Merritt Junior College. He dropped out after three semesters
due to financial problems.

Marital History: The defendant has never been married. He has a son, Quintan
LaVonne Cooks born on November 9, 1981. The child resides with his mother in
Oakland and is supported by AFDC. His mother reportedly works part time as a
secretary.

Employment History: The defendant dropped out of school in 1982 and has
worked at odd jobs since that time. He indicated that he couldn't recall exactly
how much money he earned. He reported submitting applications for factory

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2007
PAGE 4

work because he was not interested in working in fast food restaurants. He wanted a job, which demanded some physical strength and with opportunity to advance.

Financial History: The defendant has neither assets nor liabilities of any consequence. He was partially dependent on his mother and girlfriend for his support. Earnings from odd jobs took care of some of his basic needs. His dependent child is supported by AFDC.

Military History: The defendant has never served in the military.

Medical History: The defendant has a history of ulcers. He also had asthma until age 16. He is not taking any medication.

Mental Health History:

III.     POSTCONVICTION FACTORS:

A.     Special Programming/Accommodations:

None.

B.     Custody History:

Documents from previous hearings have been reviewed and remain valid. Since the prisoner's last Life Prisoner Evaluation Report, the prisoner remained at Folsom State Prison, Level II (FSP-II), in the General Population (GP), maintained Medium A (MED A) custody, Placement Score (PS) 25/Level II, continued on Voluntary Unassigned, C/C Work Group/Privilege Group (WG/PG) due to non-compliance with Grooming Standards.

On May 19, 2006, prisoner was transferred to California State Prison-Solano, Level II (CSP-SOL-II), GP. On May 30, 2006, appeared before CSP-SOL, Facility III Unit Classification Committee (UCC) for Initial Classification, custody was established MED A, removed from Voluntary Unassigned, C/C WG/PG to unassigned A2/B WG/PG effective May 30, 2006 and placed on Support Service 2 (SS2) and Academics 2 (AC2) waiting lists (W/L's). At the present time, prisoner remains housed at CSP-SOL-II, GP with MED A custody, PS: 21/Level II and on the SS2 and AC2 W/L's awaiting assignment.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2007
PAGE 5

C.    Therapy and Self-Help Activities:

He is not a participant in the Mental Health Services Delivery System (MHSDS) and did not participate in any self-help Programs during this report period.

D.    Disciplinary History:

Documents from previous hearings have been reviewed and remain valid. Since the prisoner last Life Prisoner Evaluation Report, the prisoner had the following disciplinary:

CDCR 128A's:

July 28, 2006-Disobeying Verbal Orders, authored by Correctional Officer Deberry.

E.    Other:

On August 31, 2005, prisoner appeared before the Board of Parole Hearings (BPH) for Subsequent #2, Parole Consideration Hearing. Parole was denied for two years with BPH recommending: 1) no more CDCR 115's or 128A's, 2) earn positive chronos, and 3) get self-help.

IV.    FUTURE PLANS:

A.    Residence:

Cooks plans to reside with his mother in an apartment in Oakland, California. His mother currently resides in Vacaville, California and is in the process of renting an apartment in Oakland.

B.    Employment:

Cooks plans to seek employment in the area of Upholstery or Mill and Cabinet, which he has completed training in while incarcerated. Cooks believes that as available, he can also find work in a warehouse. Cooks has previously indicated when he is able to secure his own business, he plans to pursue a small business in artistic design in printing tee shirts and selling prints.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2007
PAGE 6

    C.    Assessment:

        Cooks plans of residing with his mother may appear valid, but however, an established residence and updated letters of support would benefit his future plans.

V.    USINS STATUS:

        N/A.

VI.    SUMMARY:

    A.    Prior to release, the prisoner could benefit from remaining disciplinary-free, upgrading educationally and vocationally, and participating in self-help Programs.

    B.    This Board Report is based on an interview with the prisoner on April 16, 2007, lasting approximately one (1) hour and a complete review of the Central File lasting four (4) hours.

    C.    Prisoner was afforded an opportunity to examine his Central File and did so on April 16, 2007. (Refer to CDCR 128B dated January 30, 2006).

    D.    No accommodation for the purpose of effective communication was required per the Armstrong Remedial Plan (ARP).

Prepared by:

J. MITZEL
CCI

Reviewed by:

R. BAUGHMAN
CCII

Reviewed by:

S. MILLER
C&PR

BOARD OF PAROLE HEA...GS                                          STATE OF CALIFORNIA
LIFE PRISONER:    POSTCONVICTION PROGRESS REPORT

☐    DOCUMENTATION HEARING

☒    PAROLE CONSIDERATION HEARING

☐    PROGRESS HEARING

INSTRUCTIONS
     TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO
                    PRESENT.
     TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE
                    DATE WAS ORIGINALLY ESTABLISHED, i.e. , 0-2 MONTHS FOR PBR AND 0-4 MONTHS
                    FOR BPT.  SEE BPT 2290 - 2292, 2410 AND 2439.

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 7/27/06<br>to<br>4/17/06 | | | 1.   Placement:<br><br>Remained at Folsom State Prison, Level II (FSP-II), in the General Population (GP).<br><br>2.   Custody:<br><br>Maintained Medium A custody.  Placement Score (PS): 25/Level II. Continues C/C Work Group/Privilege Group (WG/PG) since 1/2/98, due to non-compliance with Grooming Standards.<br><br>3.   Vocational Training:<br><br>None noted.<br><br>4.   Academics:<br><br>None noted.<br><br>5.   Work Record:<br><br>None noted. |

| CORRECTIONAL COUNSELOR SIGNATURE  *Ponce* | DATE 6/13/07 |
|---|---|

| NAME | CDC NUMBER | INSTITUTION | CALENDAR/HEARING DATE | |
|---|---|---|---|---|
| COOKS, HARRY | C-84354 | CSP SOLANO | AUGUST 2007 | JM: gj |

BPT 1004(REV. 7/86)                 Page 1 of 5                PERMANENT ADDENDA          6/12/2007

CONTINUATION

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | 6.    Group Activities: |
| | | | None noted. |
| | | | 7.    Psychiatric Treatment: |
| | | | Prisoner is not a participant in the Mental Health Services Delivery System (MHSDS). |
| | | | 8.    Prison Behavior: |
| | | | Remained disciplinary-free during this period. |
| | | | 9.    Other: |
| | | | On 8/31/05, prisoner appeared before the Board of Parole Hearings (BPH) for Subsequent #2 Parole Consideration Hearing.  Parole was denied for two years with BPH recommending 1) no more CDCR 115's or 128A's, 2) earn positive chronos and 3) get self-help. |
| 4/18/06 to 4/17/07 | | | 1.    Placement: |
| | | | Remained at FSP-II, in the GP. |
| | | | 2.    Custody: |
| | | | On 5/19/06, he was transferred to California State Prison-Solano Level II (CSP-SOL-II) and continued on C/C WG/PG.  On 4/21/06, PS was reduced to 21/Level II at Annual Review. |

ORDER:

☐  BPT date advanced by _____ months.          ☐  BPT date affirmed without change.

☐  PBR date advanced by _____ months.          ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed conditions affirmed.

☐  Add or modify: _____

☐  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR/HEARING DATE | |
|---|---|---|---|---|
| COOKS, HARRY | C-84354 | CSP SOLANO | AUGUST 2007 | JM: gj |

CONTINUATION

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | On 5/19/06, prisoner was transferred to CSP-SOL-II, in the GP.  On 5/30/96, appeared before CSP-SOL, Facility III Unit Classification Committee (UCC) for Initial Classification, custody was established at MED A, removed from Voluntary Unassigned C/C to A2/B effective 5/30/06 and placed on Support Services 2 (SS2) and Academics 2 (AC2) waiting list's.

3.    Vocational Training:

None noted.

4.    Academics:

None noted.

5.    Work Record:

Continues on Voluntary Unassigned C/C.  On 5/30/06, he was placed on SS2/AC2/ABE3 W/L.

6.    Group Activities:

None noted.

7.    Psychiatric Treatment:

Prisoner is not a participant in the MHSDS. |

ORDER:

☐    BPT date advanced by _____ months.          ☐    BPT date affirmed without change.

☐    PBR date advanced by _____ months.          ☐    PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐    Previously imposed conditions affirmed.

☐    Add or modify.    _____

☐    Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR/HEARING DATE | |
|---|---|---|---|---|
| COOKS, HARRY | C-84354 | CSP SOLANO | AUGUST 2007 | JM: gj |
| BPT 1004(REV. 7/86) | | Page 3 of 5 | PERMANENT ADDENDA    6/12/2007 | |

CONTINUATION

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | 8.  Prison Behavior: <br><br> CDCR 128A's: <br><br> 7/28/06-Disobeying Verbal Orders by C/O Deberry. <br><br> 9.  Other: <br><br> None noted. |
| 4/18/07 to 6/12/07 | | | 1.  Placement: <br><br> Remains at CSP-SOL-II, GP. <br><br> 2.  Custody: <br><br> Maintained MED A custody and a PS: 21/Level II. <br><br> 3.  Vocational Training: <br><br> None noted. <br><br> 4.  Academics: <br><br> None noted. <br><br> 5.  Work Record: <br><br> Remains unassigned, is on the SS2 and AC2/ABE2 W/L awaiting assignment. |

ORDER:

☐ BPT date advanced by _____ months.

☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.

☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify. _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR/HEARING DATE | |
|---|---|---|---|---|
| COOKS, HARRY | C-84354 | CSP SOLANO | AUGUST 2007 | JM: gj |
| BPT 1004(REV. 7/86) | | Page 4 of 5 | PERMANENT ADDENDA | 6/12/2007 |

CONTINUATION

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |

6. <u>Group Activities:</u>

None noted.

7. <u>Psychiatric Treatment:</u>

Prisoner is not a participant in the MHSDS.

8. <u>Prison Behavior:</u>

Remained disciplinary free.

9. <u>Other:</u>

None noted.

Reviewed by:

_R. B. ___ 6-13-07_

R. BAUGHMAN            DATE
Correctional Counselor II

ORDER:

☐ BPT date advanced by _____ months.          ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.          ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify. _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR/HEARING DATE | |
|---|---|---|---|---|
| COOKS, HARRY | C-84354 | CSP SOLANO | AUGUST 2007 | JM: gj |
| BPT 1004(REV. 7/86) | | Page 5 of 5 | PERMANENT ADDENDA | 6/12/2007 |

SUPERIOR COURT AND STATE SUPREME COURT DECISION


EXHAUSTION OF REMEDIES

ENDORSED
FILED
ALAMEDA COUNTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA DEC 2 1 2007
COUNTY OF ALAMEDA

CLERK OF THE SUPERIOR COURT
By _____FIL. R. CRUZ_____
Deputy

IN RE

HARRY EARL COOKS,

on Habeas Corpus.

No. 77583

ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS

This Court having reviewed the petition for writ of habeas corpus ("Petition") filed on October 23, 2007 by HARRY EARL COOKS ("Petitioner"), NOW HEREBY ORDERS:

The Petition is DENIED for failure to make a prima facie case for relief.

In 1984, Petitioner a jury found Petitioner guilty of first degree murder and robbery. Petitioner was sentenced to 25 years to life with the possibility of parole on the murder. He was also sentenced to the upper term of five years on the robbery, which was stayed pending the completion of the sentence on the murder, at which such time the stay will be permanent. On August 8, 2007, the Board of Parole Hearings ("Board") found Petitioner unsuitable for parole.[1]

Petitioner filed the instant Petition seeking relief from the Board's decision. Petitioner raises a number of contentions that can be distilled to claims that the Board's denial of parole violated his due process rights and violated the *ex post facto* clause. Petitioner has failed to meet his burden of making a prima facie relief under either claim.

Our Supreme Court held in *Rosenkrantz* that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure

---

[1] This court notes that the Board's decision was not final at the time Petitioner filed his writ. Instead of denying the writ as premature, this court waited to rule on the Petition until after December 6, 2007, when the Board's decision became final so it could review the Petition on the merits. Because Petitioner has not notified this court of any modification to the Board's decision, it appears that the December 6, 2007 decision to deny Petitioner parole is now final.

1

that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole ...." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 (*Rosenkrantz*); see also *In re Lowe* (2005) 130 Cal.App.4th 1405, 1429.)

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code of Regs., tit. 15, § 2402, subd. (a).) The Board has discretion in the manner in which the specified factors relevant to parole suitability are considered and balanced, and the resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Board. Petitioner claims that the positive factors supporting parole outweigh the negative factors. However, this court cannot reweigh the factors and substitute its judgment. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Despite Petitioner's contrary claim, the Board's decision is subject to limited review under the "some evidence" standard of review. (*Rosenkrantz, supra,* 29 Cal.4th at p. 652.) Only a modicum of evidence is required. (*Id.* at p. 626.) The evidence in support of the Board's decision "'must have some indicia of reliability,'" (*In re Scott* (2005) 133 Cal.App.4th 573, 591 (*Scott*), quoting *Biggs, supra,* 334 F.3d at p. 915) and "'must have some basis in fact [.]'" (*In re Elkins* (2006) 144 Cal.App.4th 475, 489, (*Elkins*), quoting *Scott, supra,* 133 Cal.App.4th at p. 590.)

The Board found Petitioner unsuitable for parole based on the commitment offense, Petitioner's prior criminal record, his institutional behavior, his variegated programming, and parole plans.

2

As our Supreme Court noted in *Dannenberg,* "[t]he regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. (Citation omitted.) Among the specified circumstances of the commitment offense that "tend to indicate unsuitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Citation omitted.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1080 (*Dannenberg*)).

In finding that Petitioner would pose an unreasonable risks of danger if released on parole, the Board found that the offense was carried out in an especially cruel manner in that the murder was dispassionate and calculated, and the victim was abused during the offense. The Board pointed out that the victim of the murder was particularly vulnerable because the victim was 64 years old at the time of the attack and that he was unarmed in his home. Petitioner and his crime partners strangled the victim and ransacked the victim's home taking the safe, money, marijuana, and stereo equipment. The Board also pointed out that Petitioner was identified in the home controlling the victim before the murder, and later on the steps leaving the home; that Petitioner bragged to two separate witnesses about participating in the robbery/murder; and that investigators discovered the reel-to-reel recorder taken in the robbery inside Petitioner's home. Finally, the Board also noted that the victim suffered a protracted beating, and that the sweater used to strangle the victim could have been used to coerce information about the location of drugs and money, as well as the combination of the safe, which was ultimately removed from the victim's home. Despite Petitioner's claim to the contrary, the record does contain "some evidence" to support the finding that the murder was especially heinous and cruel murder.[2]

---

[2] Under both *Dannenberg* and *Rosenkrantz,* the Board can look at the circumstances of the offense and rely the facts of the crime alone, so long as it points to factors beyond the minimum elements of the crime, in determining that a prisoner is unsuitable for release. (*Dannenberg, supra,* 34 Cal.4th 1061, pp. 1070-1071;

The evidence also supports the finding, based on Petitioner's prior criminal record, that Petitioner's criminality showed an escalating pattern of criminal conduct. As a juvenile, Petitioner had been made a ward of the court after a finding of a burglary, and he had been granted probation in his mother's home. Petitioner was 20 years old at the time of the commitment offense. As an adult, he had suffered two misdemeanor convictions, one for burglary and one for possession of more than one once of marijuana.

The Board also relied on Petitioner's institutional behavior as a factor in denying parole. Petitioner's institutional behavior is far from spotless. There is some evidence that Petitioner has engaged in serious misconduct while in prison. The Board noted that Petitioner's had 14 CDC 115 while in prison, but seven were for grooming standards. The last CDC was in 2005, but it was later reduced to a CDC 128. The Board noted that Petitioner had 16 CDC 128, four of which were also for grooming standards. CDC 115 documents misconduct that is believed to be a violation of law or is not minor in nature, and a CDC 128 documents incidents of minor misconduct. (See *In re Gray* (2007) 151 Cal.App.4th 379, 389 and Cal. Code Regs., tit. 15, § 3312, subd. (a)(2) & (3).)

Additionally, the Board denied Petitioner parole based on his limited programming. One of the criteria for suitability is that "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code of Regs., tit. 15, § 2402, subd. (d)(9).) Thus, lack of such activities is relevant

---

*Rosenkrantz, supra*, 29 Cal.4th 616.) The Board relied on other factors in addition to the commitment offense, nonetheless, the circumstances of this murder went beyond those for first degree. First degree murder is characterized by a lack of special circumstance justifying the death penalty or life without the possibility of parole. (*In re Van Houten* (2004) 116 Cal.App.4th 339, 352 (*Van Houten*).) There is some evidence that the murder occurred while Petitioner was engaged in the commission of a robbery, which is a special circumstance murder. (Penal Code §190.2, subd. (a)(17)(A).) Therefore, the record contains "some evidence" that Petitioner's murder involved "particularly egregious acts beyond the minimum necessary to sustain" the conviction. (*Van Houten, supra*, 116 Cal. App. 4th at p. 353.)

4

information that may be considered by the Board. (Cal. Code of Regs., tit. 15, § 2402, subd. (b).) The record before the Board revealed that for nine years of incarceration Petitioner did not work, nor did he participated in any self-help programs, although he was on wait lists on some new programs at the time of the hearing. There is "some evidence" to support this finding.

Lastly, the Board found that Petitioner did not present any viable residential and employment plans, although it expressly noted that this was not a major factor in denying Petitioner parole. Petitioner had developed marketable skills that could be put to use upon his release, however, it the parole plans he articulated to the Board did not involve the use of those marketable skills.[3] Therefore, there is "some evidence" that Petitioner had not made realistic plans for release.

The Board's determination took into consideration all relevant and reliable factors. Some evidence supports the Board's conclusion that Petitioner currently poses an unreasonable risk of danger to society if released. Thus, the Board's denial of release on parole does not violate due process, and is supported by some evidence.

Also, Petitioner's claim that the denial of parole violates the prohibition of *ex post facto* application of the law fails to state a prima facie case for relief. Because the Board's decision complies with due process and Petitioner continues to be eligible for parole, the decision to deny Petitioner parole did not increase the penalty for the murder.

DATED: ___DEC 2 1 2007___          ~~LARRY J. GOODMAN~~
                                    _____
                                    HON. LARRY GOODMAN
                                    JUDGE OF THE SUPERIOR COURT

---

[3] Exhibit C to the Petition contains several letters, which appear to contain original signatures. These letters were not available to the Board at the time of the hearing. Petitioner did inform the panel of the letters' existence, but stated that he had given them to his counselor and that they never made it to the C-file. None of these letters are from businesses expressing an interest in supporting Petitioner market his business of artistic illustrations and designs. Instead, the letters offer general support of Petitioner's release on parole.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA          Dept. No. 9

Date: December 21, 2007      Hon. LARRY GOODMAN, Judge          , Dep.Clk.
                                                                 Not Reported, Reporter

---

IN RE: HARRY EARL COOKS                    Counsel appearing: No Appearance
                    Petitioner             for Petitioner

                                           Counsel appearing:   No Appearance
vs.                                        for Respondent

PEOPLE OF THE STATE OF CALIFORNIA

                    Respondent

---

Nature of Proceedings:  ORDER DENYING PETITON FOR WRIT OF HABEAS CORPUS

                                                    Case No: 77583
                                                    PFN:AMQ-28
                                                    CEN: 3073777

This Court having reviewed the Petition for Writ of Habeas Corpus filed on October 23, 2007 by Petitioner, HARRY EARL COOKS NOW , HEREBY ORDERS.

The Petition is DENIED for failure to make a prima facie case for relief.

Please find enclosed endorsed filed copy of Judge Goodman's Order Denying Petition for Writ of Habeas Corpus, signed and filed December 21, 2007.

### CLERK'S CERTIFICATE OF MAILING (CCP 1013a)

I certify that the following is true and correct:  I am a Deputy Clerk employed by the Alameda County Superior Court. I am over the age of 18 years. My business address is 1225 Fallon Street, Oakland, California. I served this ORDER REGARDING EX PARTE PETITION FOR WRIT OF HABEAS CORPUS, by placing a copy in an envelope addressed as shown below and then by sealing and placing it for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Oakland, California, following standard court practices.

Harry Cooks
CDC # C-84354  15-L-1-L
P. O. Box 4000  CSP - Solano
Vacaville, CA 95696-4000

Dated: December 21, 2007

Executive Officer/Clerk of the Court

By: _____
Fil R. Cruz, Deputy Clerk
Enclosed: as stated above

(Rev. 5/3/07)

S160535

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re HARRY COOKS on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

JUL 16 2008

Frederick K. Ohlrich Clerk

_____ Deputy

GEORGE
_____
Chief Justice

LEGAL MAIL

P.O. BOX 4000
Vacaville, CA  95696-4000



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE ™
www.usps.gov

LABEL107R, OCT 1997

RECEIVED

AUG 2 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DIST. OF CALIFORNIA

CALIFORNIA STATE PRISON-SOLANO

CLERK OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
BOX 36060
SAN FRANCISCO, CA  94102

CSP SOLANO
STATE PRISON



UNITED STATES POSTAGE
$ 04.80°
02 1A
0004632981    AUG 25 2008
MAILED FROM ZIP CODE 95687



STATE OF CALIFORNIA
CDC - 193 (1/88)

**TRUST ACCOUNT WITHDRAWAL ORDER**

DEPARTMENT OF CORRECTIONS

To: Warden

Date _____ August 22, 20 08

I hereby request that my Trust Account be charged $ 5.00

the withdrawal of that sum from my account:

Approved _____ for the purpose stated below and autho[r]

_____
C-84354
NUMBER

State below the PURPOSE for which withdrawal is requested
(do not use this form for Canteen or Hobby purchase).

PURPOSE.  **NEED CHECK MADE OUT FOR**
**$5.00 FILING FEE CHARGE TO FILE**
**FEDERAL HABEAS PETITION:**

_____
NAME (Signature please DO NOT PRINT)

PRINT PLAINLY BELOW name and address of
to whom check is to be mailed.

NAME **CLERK OF THE UNITED STATES**
**FOR THE NORTHERN DISTRICT O[F**
ADDRESS **BOX 36060   450 GOLDEN GATE AVENU[E**
**SAN FRANCISCO, CA   94[1**

_____
PRINT YOUR FULL NAME HER[E]